CEVDET URUK
103 Kinman Ave
Goleta, CA 93117
urukcevdet@gmail.com
805-635-7862
Pro Se

**NO CV 30**



FILED
CLERK, U.S. DISTRICT COURT
01/19/2026
CENTRAL DISTRICT OF CALIFORNIA
BY_____GSA_____DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CEVDET URUK,
      Plaintiff,

     v.

SANTA BARBARA COUNTY SHERIFF'S
OFFICE,
DEPUTY J. MALON,
SERGEANT DUGGER,
LIEUTENANT S. CELMETA,
LIEUTENANT R. BRITTINGHAM,
SERGEANT A. KOUREMETIS,
DEPUTY W. HENEBRY,
SANTA BARBARA COUNTY
PROBATION DEPARTMENT,
PROBATION OFFICER R. FAANONO,
CITY OF SANTA BARBARA POLICE
DEPARTMENT,
OFFICER R. MESTAS,
DETECTIVE B. FORD,
SANTA BARBARA COUNTY DISTRICT
ATTORNEY'S OFFICE,
INVESTIGATOR K. SHAMORDOLA,
INVESTIGATOR D. MCGREW,
NATALIE URUK,
And
JOHN DOES 1–10
          Defendants

**Case No.:**

**2:26-cv-01771-MWF-SP**

**COMPLAINT FOR
CIVIL RIGHTS VIOLATIONS**
(42 U.S.C. § 1983)

VERIFIED

JURY TRIAL DEMANDED

1

## I. JURISDICTION AND VENUE

1.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983. Supplemental jurisdiction over any state law claims is invoked under 28 U.S.C. § 1367.

2.  Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Santa Barbara County, and the Defendants reside or operate in this district.

## II. PARTIES

3.  Plaintiff **Cevdet Uruk** is a resident of Santa Barbara County, California. He is a former university professor, a current law school student, and a Turkish-American stay-at-home father. He was wrongfully convicted and cruelly sentenced by an infamous Judge, who was later barred from the bench for life. He was incarcerated from June 26, 2019, until October 20, 2023, at California Correctional

2

Institution (CCI) and consecutively at Santa Barbara County Jail. He remains a grateful American.

4. Defendant **Natalie Uruk** is Plaintiff's ex-wife and a private individual who conspired with state actors to deprive Plaintiff of his constitutional rights and premarital separate property (condo, money, retirement savings, vehicles, furniture, belongings).

5. Defendant **Santa Barbara County Sheriff's Office** is a law enforcement agency operating under color of state law.  It is sued in its **official capacity** for its policies, customs, or practices that contributed to the violations, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and injunctive and declaratory relief.

6. Defendant **Deputy J. Melon** is a custody officer employed by the Alternative Sentencing Bureau of the Sheriff's Office and is sued in his **official and individual capacities**.

7. Defendant **Sergeant Dugger** is a custody officer employed by the Alternative Sentencing Bureau of the Sheriff's Office and is sued in his **official and individual capacities**.

3

8. Defendant **Lieutenant Celmeta** is a custody officer employed by the Alternative Sentencing Bureau of the Sheriff's Office and is sued in his **official and individual capacities**.

9. Defendant **Lieutenant Brittingham** is an officer employed by the Sheriff's Office and is sued in his **official and individual capacities**.

10. Defendant **Sergeant Kouremetis** is an officer employed by the Sheriff's Office and is sued in his **official and individual capacities**.

11. Defendant **Deputy W. Henebry** is an officer employed by the Sheriff's Office and is sued in his **official and individual capacities**.

12. Defendant **Santa Barbara County Probation Department** is a municipal entity responsible for probation supervision in Santa Barbara County. It is sued in its **official capacity** for its policies, customs, or practices that contributed to the violations, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and injunctive and declaratory relief.

13. Defendant **Probation Officer R. Faanono** is a deputy probation officer employed by the Probation Department. She is sued in her **official and individual capacities**.

4

14. Defendant **City of Santa Barbara Police Department** is a municipal entity responsible for law enforcement in the City of Santa Barbara. It is sued in its **official capacity** for its policies, customs, or practices that contributed to the violations, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and injunctive and declaratory relief.

15. Defendant **Officer Mestas** is a police officer employed by the City of Santa Barbara Police Department. He is sued in his **official and individual capacities.**

16. Defendant **Detective Ford** is a detective employed by the City of Santa Barbara Police Department. He is sued in his **official and individual capacities.**

17. Defendant **Santa Barbara County District Attorney's Office** is a prosecutorial agency operating under color of state law. It is sued in its **official capacity** for its policies, customs, or practices that contributed to the violations, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and injunctive and declaratory relief.

5

18. Defendant **Investigator Shamordola** is an investigator employed at the District Attorney's Office and is sued in her **official and individual capacities**.

19. Defendant **Investigator McGrew** is an investigator employed at the District Attorney's Office and is sued in his **official and individual capacities**.

20. Defendants **John Does 1–10** are unidentified officials or employees of the above agencies who participated in the violations and will be named upon discovery.

### III. TOLLING OF THE STATUTE OF LIMITATIONS

21. Plaintiff's claims are timely under the applicable statute of limitations:

   a. Plaintiff was incarcerated in state prison and consecutively in jail from June 26, 2019, until October 20, 2023. Pursuant to California Government Code § 945.3 and federal law, the statute of limitations was tolled during the entire period of incarceration.

   b. Plaintiff did not discover the full extent of the thefts, identity thefts, and alleged conspiracy by Defendants until 2025. The related

claims, therefore, did not accrue until 2025 under the federal discovery rule (*Wallace v. Kato*, 549 U.S. 384 (2007)).

c. Even if the claims accrued earlier, equitable tolling applies due to extraordinary circumstances that prevented timely filing despite Plaintiff's diligent efforts. These circumstances include:

i. Plaintiff's incarceration from June 26, 2019, to October 20, 2023, during which he lacked access to financial records, electronic devices (which were in Defendant Natalie Uruk's possession), and legal resources.

ii. Plaintiff's disability, including severe physical (tinnitus, vision impairment), and mental health (PTSD, depression, anxiety, claustrophobia, OCD) conditions resulting from incarceration and ongoing medical issues, which substantially impaired his ability to investigate the thefts, gather evidence, or prepare and file legal documents during and after incarceration.

iii. Plaintiff's reasonable fear of retaliation and further prosecution while incarcerated in jail and while facing an active

7

probation violation charge. Defendants' threats, intimidation, false accusations, and attempts to arrest Plaintiff created a credible risk that filing a civil rights lawsuit would provoke harsher probation enforcement, additional charges, revocation of probation, and further incarceration.

iv. The ongoing criminal and family law proceedings (including the State and Federal habeas petitions for two separate convictions, the divorce case and its appeal, restraining order disputes and associated extraordinary writ petitions, and probation violation prosecution) that consumed all of Plaintiff's available time, energy, and resources, as a self-represented defendant/respondent, leaving no realistic capacity to pursue a complex federal civil rights action earlier.

v. Plaintiff's good-faith efforts to resolve the issues, including the thefts and related crimes through state court and administrative processes, including reporting to the Sheriff's Office in February and March 2024, filing complaints in September and October 2025, attempting to file with the District Attorney's Office in November 2025, and filing complaints with the California Attorney General's

8

Office. He also reported the crimes to the FBI, the U.S. Department of Justice, and the U.S. District Attorney's Office. In addition, he filed claims with Interactive Brokers, Bank of America, FINRA, and CFPB.

d. Plaintiff acted with reasonable diligence under the circumstances: upon release in October 2023 and after discovering the full scope of the thefts in 2025, he promptly reported the crimes, pursued administrative remedies, and, when those were denied, prepared and filed this action.

e. These factors warrant equitable tolling (see *Lukovsky v. San Francisco*, 535 F.3d 1044 (9th Cir. 2008)).

f. Therefore, the statute of limitations has not expired.

## IV. STATEMENT OF FACTS

### A. BACKGROUND

22. Plaintiff's then wife, Natalie Uruk, has been abusing the Plaintiff and their three children (ages 1, 3, 5 in 2019) physically and psychologically. They were married between 2012 and 2024 and lived together until Plaintiff's incarceration in 2019. As she wished, she was

9

the breadwinner as a Software Analyst, and the Plaintiff was the stay-at-home Dad providing primary care to the children.

23. She is an admitted and verified liar and paranoiac. She is violent, dangerous, and sadomasochistic. She has made around 20 false police reports against the Plaintiff, her own father, her next-door neighbour, and strangers since 2013.

24. When Plaintiff wanted to leave her on several occasions, she told him, "I am gonna get your money, and I am not gonna show you the baby," and "I'll send you to prison, and you'll die there."

25. Since 2013, she has weaponized the law enforcement and the judicial system with her false reports and conspired with the Defendants to accomplish her evil goals.

26. She regretted and recanted most of the time.

27. In 2019, the Plaintiff was wrongfully convicted with the admission of her inadmissible hearsay statements as the sole evidence and exclusion of her admissible inconsistent and recanting statements and cruelly sentenced to eight years in prison, and consecutive, unheard of four years in jail, due to hatred stemming from racism, sexism, and

10

vindictiveness resulting from Plaintiff's refusal of the prosecution's plea offer of probation without any custody time and exercising his constitutional rights to freedom of expression by quoting a biblical verse ("Wives Submit to Your Husbands") and a WSJ article ("Woman Failed Humanity"), trials, and appeals.

28. Although the integrity of the convictions is questionable due to the presiding judge's infamous character and bar from the bench, and pending Habeas Corpus review in this court, the claims do not challenge the validity of the conviction but only post-conviction violations.

29. In 2021, Plaintiff was also barred from contacting his children for five years illegally, inhumanely, and baselessly, both by a criminal protective order and a domestic violence restraining order, as further vindictiveness.

30. This is a very long and complex case involving a conspiracy among law enforcement, attorneys, prosecutors, and judges for over a decade. See Attachment 1 for the details of the conspiracy.

31. All the paragraphs from Attachment 1 are incorporated here.

11

32. The dates and time periods set forth herein are approximate based on Plaintiff's recollection and available records. Plaintiff was incarcerated from 2019 to October 20, 2023, which limited his ability to maintain contemporaneous records. Exact dates will be supplemented through discovery.

33. All Defendants acted under color of state law. Their actions were intentional, malicious, and/or with deliberate indifference to Plaintiff's constitutional rights.

**B. JAIL INCIDENTS**

34. In 2022, after his release from prison and transfer to the County Jail, Plaintiff was eligible and suitable for in-house detention with electronic monitoring under California law, with a very low-risk assessment score of 1-2/10 (even with the false convictions) based on validated assessment tools, and with suitable housing and strong support from family and friends.

35. Despite repeated requests and appeals, Defendants Deputy Melon, Sergeant Dugger, and Lieutenant Celmeta at the Sheriff's Office's

12

Alternative Sentencing Bureau discriminately denied in-house detention.

36. The District Attorney's Office (DDA Chanda) intervened and contributed to the denial due to animus based on Plaintiff's race/national origin (Turkish American), sex, and in retaliation for Plaintiff's rejection of a plea offer of no jail/prison probation and for exercising constitutional rights to trials, appeals, and freedom of expression.

37. Plaintiff repeatedly notified the Defendants of severe mental health conditions (PTSD, depression, anxiety, and claustrophobia) and high risk due to his race, and innocent and peaceful character among violent gangs, and requested accommodations and safety protections. These requests were ignored.

38. During Plaintiff's jail time, Plaintiff personally spoke with Sheriff Bill Brown. Following that conversation, Plaintiff sent Sheriff Brown a detailed letter (as requested by the Sheriff) explaining the conspiracy and the safety and health risks.

39. Plaintiff also wrote to his second in command.

13

40. While in custody, Plaintiff—a small, peaceful individual—was subjected to frequent intimidation, bullying, and physical assaults by other inmates.

41. One gang assault in August 2023 caused a severe eye injury requiring emergency medical treatment, multiple stitches, and resulting in permanent vision impairment.

42. The Sheriff's Office failed to protect Plaintiff despite known risks.

43. Defendants conspired to subject Plaintiff to these conditions in retaliation and due to discriminatory animus.

**C. PROBATION INCIDENTS**

44. In 2024, just after his release from jail, while Plaintiff was on probation, and involved in a dissolution of marriage case filed in 2022, his ex-wife, Natalie, made three false accusations intended to violate his probation, send him back to jail, and prevent him from responding in the dissolution proceedings to claim his separate property (See Attachment 2). Knowing his routines, she was trying to frame the Plaintiff by following him.

14

45. The first accusation was that Plaintiff allegedly failed to stay away from his ex-wife at a 200+-acre San Marcos nature preserve. The plaintiff saw her and immediately left the area. A judge found him not guilty of this violation allegation.

46. The second false accusation involved Natalie claiming that Plaintiff followed her at a farmers' market. The plaintiff saw her, immediately left the area, and did not follow her. Natalie delayed reporting the incident by three days before contacting the Santa Barbara Police Department.

47. Defendant Officer Mestas prepared a police report falsely stating that Plaintiff followed Natalie, requested a charge, and sought an investigation of the parking lot surveillance video (Attachment 3).

48. Defendant Detective Ford investigated and reviewed the GPS tracks and surveillance video, which showed that Plaintiff did not follow her, yet still recommended a criminal charge for being in the area. Neither Defendant Mestas nor Defendant Ford returned Plaintiff's calls seeking to provide exculpatory information.

49. The District Attorney's Office declined to file a new criminal charge. However, the false police reports were used in probation violation

15

proceedings, and another corrupt judge, as part of the conspiracy, wrongfully found Plaintiff guilty, but this finding is currently on appeal.

50. Plaintiff has stayed away from and had no contact with his children and Natalie for five years, and has successfully completed his probation. No decent person could have found him guilty of a violation.

51. This claim does not seek to invalidate the probation violation finding, which is separately on appeal, but rather seeks damages for the officers' own constitutional violations in the course of their investigations and for their participation in the conspiracy.

52. To the extent any claim could be construed as challenging the validity of the probation violation finding, Plaintiff does not seek relief that would imply its invalidity, and any such claim is not asserted herein.

53. The third accusation claimed Plaintiff accessed his children's medical records in violation of a restraining order using his ex-wife's credentials. In fact, Plaintiff used his own credentials as his statutory right. Defendant Deputy Henebry prepared the deputy report

16

recommending a charge, and Sergeant Kouremetis approved it (Attachment 4). The District Attorney's Office didn't file a new charge. The judge did not allow this exculpatory allegation to proceed to a probation violation hearing.

54. These false reports were part of the broader conspiracy, and Defendants pursued them despite knowing or having reason to know they were baseless.

55. Defendants denied the reports of exculpatory evidence.

56. Defendants' actions extended beyond these reports and constituted a pattern of discrimination against Plaintiff due to his Turkish-American national origin, sex, and vindictiveness for exercising his constitutional rights to freedom of speech, trials, and appeals, as well as retaliation for a formal complaint he filed against Probation Officer Faanono.

   a. Specifically, Defendant Faanono determined Plaintiff was ineligible for a free Batterer's Intervention Program (BIP) despite his eligibility while on food stamps after five years of incarceration, which was unreasonable and discriminatory.

17

b. She directed Plaintiff to attend a seven-week reasoning class (two sessions per week, 1.5 hours each), designed for mentally ill, uneducated, or substance-abusing individuals. As a former university professor and law school student with no reasoning issues, this directive was arbitrary, unauthorized, and akin to requiring a non-drinker to attend alcohol abuse treatment.

c. She prohibited Plaintiff from emailing her and failed to respond to his emails and phone calls, making communication unreasonably difficult.

d. She denied Plaintiff's request to travel to Ventura for a medical appointment without justification.

e. She directed Plaintiff not to go to San Marcos Preserve, despite Senior Probation Officer Macedo stating he could not impose such a directive, rendering it an unauthorized and unreasonable condition.

f. She imposed new, unreasonable probation conditions. She had neither the authority nor the reason to impose new probation conditions.

18

g. Defendant Faanono refused to hear Plaintiff's account or consider exculpatory evidence, including incident reports, GPS tracks, and Natalie's crimes.

h. In her probation violation report (PVR), she falsely stated that Plaintiff contacted the restrained party (his ex-wife) in San Marcos Preserve, and violated the restraining order, despite the restrained party admitting no contact or violation, and two separate sheriff's deputies determining no violation or contact in their reports.

i. She misrepresented facts in the report by claiming Plaintiff was directed "several times" to find a new location and did not agree, when he was directed only once and promptly complied, though the directive was unauthorized and unreasonable.

j. The alleged basis for the violation was not noncompliance with directives but a no-contact order violation, further highlighting the falsity and pretextual nature of the report.

57. These actions were not reasonably related to Plaintiff's rehabilitation, public safety, or the underlying offense, and exceeded Defendant

19

Faanono's authority under California Penal Code § 1203.1 and constitutional standards.

58. Defendants Natalie Uruk, Probation Officer Faanono, Officer Mestas, Detective Ford, Deputy Henebry, and Sergeant Kouremetis acted in joint action and conspiracy: Natalie Uruk provided knowingly false information; Mestas, Ford, Henebry, and Kouremetis prepared and advanced false reports despite exculpatory evidence; Faanono relied on these reports to file a false probation violation report and impose unauthorized conditions. The Probation Department and the District Attorney's Office pursued the false violation charges. The timing, delays, ignored evidence, and pretextual nature demonstrate this agreement.

59. The Probation Department did not resolve any of the issues raised in Plaintiff's formal complaints.

60. As a result of these violations, Plaintiff suffered actual damages, including but not limited to wrongful detention, severe emotional distress, and restrictions on his liberty and professional and family life (extended no-contact with his children).

20

## D. THEFTS

61. Between September and December 2021, while Plaintiff was incarcerated, Defendant Natalie Uruk stole $85,000 from Plaintiff's mother's Interactive Brokers account and over $10,000 from Plaintiff's Robinhood account by stealing their identities and accessing their accounts using Plaintiff's computer and cell phone, which she possessed. First, she transferred the stolen funds to Plaintiff's Bank of America account. She then transferred around $100,000 to her own Chase Bank account (Attachment 5).

62. Natalie lost nearly all of these funds in scam investments, along with an additional approximately $150,000 from an unknown source, probably from a charity, with the assistance of the District Attorney's Office.

63. Plaintiff's mother is 75 years old, illiterate, and a resident of Turkiye. The plaintiff was the authorized user on her Interactive Brokers account and served as the family's financial advisor. Natalie had no authorization to access this account or any of the transfers.

64. Plaintiff discovered most of these thefts in 2024 after his release.

21

65. On February 20, 2024, Plaintiff reported the thefts and other crimes (false police reports, perjuries, and child abuse by Natalie) to Defendant Lieutenant Brittingham.

66. Brittangam assigned the matter to Defendant Sergeant Kouremetis.

67. On March 19, 2024, Kouremetis accused Plaintiff of being a terrorist and narcissist, refused to investigate, threatened to charge Plaintiff with stalking, and attempted to arrest him based on a false probation report prepared by Defendant Deputy Henebry and approved by Kouremetis (Attachment 8).

68. Brittingham refused to investigate the March 19 incident or provide his commander's contact information. He previously refused to assist Plaintiff in accessing his residence and belongings despite a judge's order (Attachment 90).

69. The Sheriff's Office informed Plaintiff that no incident report exists, and neither Brittingham nor Kouremetis responded to requests for the incident reports.

70. In September 2025, Plaintiff filed a complaint against them, and in October 2025, he renewed his complaint for the thefts, which was

22

denied immediately, stating it had been heard by the courts (the courts refused to hear it) and directing Plaintiff to the DA's Office (Attachment 6).

71. In December 2025, Deputy Green, on behalf of Sheriff Brown, denied the September complaint (Attachment 7).

72. In November 2025, Plaintiff attempted to file a report/complaint with the District Attorney's Office. Defendants Investigators Shamordola and McGrew refused to file and investigate, stating that the Sheriff's Department should handle it (Attachment 10).

73. The thefts reported by Plaintiff were completely unrelated to any probation violation allegation or active criminal case against Plaintiff. The DA's Office's refusal to communicate with or investigate Plaintiff's credible theft and law enforcement misconduct complaints — while previously accepting and acting on false reports from Defendant Natalie Uruk — was not based on any legitimate conflict but reflected deliberate indifference and discriminatory treatment.

74. During the pendency of Plaintiff's appeal in the divorce proceedings, an automatic stay under California Code of Civil Procedure § 916 was

23

in effect, prohibiting the transfer of property awarded in the trial court judgment.

75. Despite the automatic stay, Defendant Natalie Uruk, with the assistance of her legal representatives, attempted to transfer property to herself, thereby violating the stay.

76. Natalie's counsels accessed confidential court records without a proper court order or subpoena, utilizing the District Attorney's Office as a conduit, as part of the conspiracy.

77. Her counsels advised her to retain or conceal the proceeds of the stolen funds.

78. Natalie and her counsels knowingly misled the law enforcement and the courts by providing misleading information regarding the thefts, the automatic stay, and the property status.

79. The justice system has classified Plaintiff as a terrorist, a woman abuser, a child abuser, and one of the most dangerous convicted felons, despite his peaceful and innocent character.

80. The conspiracy among Defendants was motivated by racism against Plaintiff's Turkish national origin, sexism, and vindictiveness for

24

Plaintiff turning down the prosecution's plea offer and instead exercising his constitutional rights to freedom of expression, complaints, trials, and appeals.

81. This pattern of misconduct by Defendant Natalie Uruk began earlier and continued over the years. In 2019, just before Plaintiff's criminal trial, Natalie made false allegations to the District Attorney's Office, claiming that Plaintiff: (1) left her and their children with a bear in the wilderness and ran away two years prior, and (2) assaulted her in Turkiye six months prior.

82. As she had done many times prior, she regretted and recanted.

83. These 2019 allegations were baseless (and ridiculous); Plaintiff was never charged with any related crimes, and they were not introduced at the 2019 trial.

84. In 2021, Natalie sought to communicate with the Plaintiff and requested money.

85. Plaintiff told her that she needed to modify the no-contact order in order to communicate. She told him she would. Then changed her mind.

25

86. Plaintiff suspects the District Attorney's Office dissuaded her with financial and legal help.

87. Then she took the legitimate letters Plaintiff had written to their children—concerning her and the children's safety and well-being—and provided them to the District Attorney's Office.

88. These letters and related phone calls had been needed, requested, and facilitated by Natalie herself. Despite this, a District Attorney's Office investigator prepared a report based on Natalie's submission, recommending or supporting charges against Plaintiff for dissuading a witness and violating the no-contact order with Natalie by contacting the children (Plaintiff was not barred from contacting his children at that time).

89. The dissuading a witness charge was legally and factually impossible, as the communications occurred after trial and sentencing and were initiated or facilitated by Natalie. This charge was ultimately dismissed.

90. She filed another false deputy report in 2023, alleging that Plaintiff violated the no-contact order by attempting to serve, through a server,

26

a summons and complaint against her for defamation. A charge was recommended, but no charge was filed for this report.

91. These actions further demonstrate Natalie's longstanding pattern of deceptive and misleading reports to law enforcement, which state actors (including the unidentified investigator and deputy) accepted and acted upon without scrutiny, while systematically refusing to investigate Plaintiff's credible reports of thefts, child abuse, and fraud by Natalie.

92. As part of the conspiracy, the divorce and the probation violation courts refused to hear the thefts despite Natalie's admissions and undisputable bank statements, depriving Plaintiff of a full and fair opportunity to litigate, thus no res judicata applies (per *Dale v. Dale*, 66 Cal.App.4th 1172 (1998))."

93. In addition, Plaintiff doesn't have access to the state courts due to a false vexatious litigant designation for four legitimate requests, as part of the conspiracy.

27

94. Plaintiff also reported the incidents to the prosecuting Deputy District Attorneys Somait and London, District Attorney Savrnoch, and the courts.

## V. CLAIMS FOR RELIEF

95. The above paragraphs are incorporated in front of each claim separately.

## B. JAIL INCIDENTS

**(Against Defendants Natalie Uruk, District Attorney's Office, Sheriff's Department, Deputy Melon, Sergeant Dugger, Lieutenant Celmeta)**

### FIRST CLAIM: First Amendment Retaliation

96. Plaintiff's exercise of his constitutional rights, including freedom of expressions, trials, and appeals, constituted protected speech under the First Amendment.

97. Defendants retaliated against Plaintiff for exercising his First Amendment rights by denying in-house detention, ignoring safety and

28

mental health requests, and subjecting Plaintiff to dangerous conditions.

## SECOND CLAIM: Fourteenth Amendment Equal Protection Violation

98. Defendants discriminated against Plaintiff on the basis of race/national origin (Turkish American) and sex by denying in-house detention and protections that would have been afforded to others similarly situated.

## THIRD CLAIM: Fourteenth Amendment Due Process Violation

99. Defendants violated Plaintiff's due process rights by arbitrarily denying in-house detention and failing to consider or accommodate Plaintiff's documented serious mental health conditions and safety concerns.

## FOURTH CLAIM: Eighth Amendment Deliberate Indifference to Serious Medical Needs

100. Defendants were deliberately indifferent to Plaintiff's serious mental health conditions (PTSD, tinnitus, depression, anxiety, and claustrophobia), creating a substantial risk of harm.

29

**FIFTH CLAIM: Eighth Amendment Failure to Protect**

101.   Defendants failed to protect Plaintiff from known risks of assault in custody, resulting in severe physical injury and permanent vision impairment.

**SIXTH CLAIM: Conspiracy to Deprive Civil Rights (42 U.S.C. §§ 1983 and/or 1985(3))**

102.   Defendants conspired to violate Plaintiff's constitutional rights through coordinated actions to deny protections, retaliate, and subject Plaintiff to discriminatory and dangerous conditions.

**DAMAGES FROM JAIL INCIDENTS**

103.   As a result of the Defendants' actions, Plaintiff suffered liberty (in-house detention), permanent vision impairment, physical injuries, exacerbation of PTSD, depression, anxiety, tinnitus, and claustrophobia, severe emotional distress, pain, and suffering, teeth loss (medical expenses), and loss of quality of life.

30

## C. PROBATION INCIDENTS

**(Against Defendants Natalie Uruk, Probation Officer Faanono, Officer Mestas, Detective Ford, Deputy Henebry, Sergeant Kouremetis, Sheriff's Department, Police Department, Probation Department, and District Attorney's Office)**

**SEVENTH CLAIM: First Amendment Retaliation**

104.   Plaintiff's exercise of his constitutional rights, including freedom of expressions, trials, appeals, and filing a complaint against Defendant Faanono, constituted protected speech under the First Amendment.

105.   In retaliation, Defendants took adverse actions, including filing false reports, a false probation violation report, and refusing to admit evidence, with a causal link supported by the timing and her patterns of conduct.

106.   These actions chilled Plaintiff's speech and caused harm, violating clearly established law.

**EIGHTH CLAIM: Fourteenth Amendment Equal Protection Violation (National Origin Discrimination)**

31

107.   Defendants intentionally treated Plaintiff differently from similarly situated probationers without a rational basis, motivated by animus toward his Turkish-American national origin, as shown by the false reports, arbitrary denials and directives.

108.   This disparate treatment violated Plaintiff's right to equal protection under the Fourteenth Amendment.

109.    Municipal Agencies maintained policies or customs enabling such discrimination.

**NINTH CLAIM: Fourteenth Amendment Due Process Violations (Procedural and Substantive)**

110.   Defendants deprived Plaintiff of liberty without due process by fabricating evidence, ignoring exculpatory information, and imposing arbitrary conditions (*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004).

111.   Defendants deprived Plaintiff of liberty interests (e.g., freedom from unreasonable conditions and false reports) without procedural due process, including by refusing to consider exculpatory evidence and misrepresenting facts.

32

112.   Substantively, the directives and reports were arbitrary, capricious, and shocking to the conscience, unrelated to legitimate probation goals.

113.   These actions clearly violated established due process rights.

**TENTH CLAIM: Fourth Amendment Violation (False Reports Leading to Unreasonable Seizure)**

114.   The false and misrepresented information in the reports led to Plaintiff's potential or actual seizure (e.g., detention or revocation proceedings) without probable cause.

115.   Defendants acted with deliberate indifference or recklessness to the falsity.

**ELEVENTH CLAIM: Conspiracy to Violate Civil Rights**

116.   Defendants agreed and acted to deprive Plaintiff of constitutional rights through false reports and violations.

117.   Defendants reached an agreement or acted in joint action to deprive Plaintiff of his constitutional rights by pursuing false police and probation violation reports and imposing unauthorized conditions.

33

118.   In furtherance of this conspiracy, they committed overt acts, including filing and relying on knowingly false reports, resulting in the deprivations described above.

## TWELFTH CLAIM: Malicious Prosecution (California State Law)

119.   Defendants initiated or continued criminal charges and probation violation proceedings against Plaintiff without probable cause, with malice, and for an improper purpose. The proceedings terminated in Plaintiff's favor on at least two of the three accusations (not guilty on the first; third not pursued).

## THIRTEENTH CLAIM: Intentional Infliction of Emotional Distress (California State Law)

120.   Defendants' extreme and outrageous conduct—filing false reports, conspiring to incarcerate Plaintiff, and imposing arbitrary conditions—intentionally or recklessly caused Plaintiff severe emotional distress, particularly in the middle of the dissolution proceedings.

## DAMAGES FROM PROBATION VIOLATION INCIDENTS

121. As a direct and proximate result of Defendants' unlawful actions and conspiracy, Plaintiff has suffered and continues to suffer the following damages:

a. **Wrongful detention and potential incarceration** arising from the false probation violation proceedings;

b. **Severe emotional distress**, including anxiety, depression, humiliation, mental anguish, sleep disturbances, and other psychological harm;

c. **Economic losses**, lost wages, and professional opportunities due to restrictions on liberty and medical care;

d. **Loss of liberty** through the imposition of unreasonable, unauthorized, and punitive probation conditions;

e. **Reputational harm** in his professional, academic, and personal communities as a former university professor and current law student;

35

f. **Physical manifestations of stress**, including health deterioration attributable to the ongoing harassment and violations;

g. **Interference with parental rights** and family relationships, including a further bar from contacting his children.

i. **Loss of all his premarital property** during the dissolution proceedings due to impaired defense (omissions) resulting from mental disability exacerbated by probation violation proceedings and potential incarceration stress.

## D. THEFTS

**(Against Defendants Natalie Uruk, Sergeant Kouremetis, Lieutenant Brittingham, Santa Barbara Sheriff's Office, Investigator Shamordola, Investigator McGrew, District Attorney's Office)**

**FOURTEENTH CLAIM: Fourteenth Amendment Violation of Due Process**

122.  Defendants deprived Plaintiff of property and liberty without due process by refusing to investigate Natalie's thefts, child abuse, perjuries and charge her, facilitating Natalie's retention of stolen funds, and abusing the judicial system in the criminal and civil

36

proceedings as a victim, rather than as a perpetrator of the thefts and domestic violence, attempting property transfers in violation of the automatic stay, and pursuing baseless charges.

123.   Defendants treated Plaintiff differently from similarly situated victims by refusing to investigate the thefts and other crimes solely because of his national origin, sex, and vindictiveness for rejecting the plea offer and exercising his constitutional rights to freedom of expression, trials, and appeals, and status as a former defendant, despite the thefts being unrelated to any probation violation or active case.

**FIFTEENTH CLAIM: Fourteenth Amendment Violation of Equal Protection**

124.   Defendants selectively refused to investigate Plaintiff's complaints and pursued charges against him based on discriminatory animus (including racism against his Turkish national origin and sexism), treating him differently from similarly situated individuals. This is evidenced by the DA's Office entertaining Natalie's false 2019 allegations and 2021 submission (leading to a DA investigator's report

37

and charges, one dismissed), while refusing to investigate Plaintiff's reports.

125.   Defendants treated Plaintiff differently from similarly situated victims by refusing to investigate the thefts solely because of his status as a former defendant, despite the thefts being unrelated to any probation violation or active case.

**SIXTEENTH CLAIM: Conspiracy to Violate Civil Rights (42 U.S.C. § 1983)**

126.   Defendants conspired to deprive Plaintiff of his constitutional rights by:

a.  Committing and concealing thefts and identity thefts.

b.  Refusing to investigate or prosecute Natalie's crimes.

c.  Accessing and providing confidential court records without legal authority.

d.  Advising Natalie, guiding, avoiding, and retaining stolen funds, and misleading law enforcement and courts.

38

e.  Pursuing baseless charges, including through Natalie's 2021 submission of Plaintiff's letters and the DA investigator's report supporting charges (one of which was dismissed), despite Uruk's facilitation of the contact.

f.  The conspiracy was motivated by racism (national origin), sexism, and vindictiveness for Plaintiff exercising his constitutional right to reject a plea offer, freedom of expression, trials, and appeals.

**SEVENTEENTH CLAIM: First Amendment Retaliation (42 U.S.C. § 1983)**

127.  Defendants retaliated against Plaintiff for exercising his First Amendment rights to freedom of expression, complaints, access to the courts, trials, and appeals by refusing to investigate the thefts, making false accusations, pursuing baseless charges, and conspiring to deprive him of property in vindictiveness for rejecting the prosecution's plea offer.

39

**EIGHTEENTH CLAIM: Conversion (California State Law) (Against Defendant Natalie Uruk)**

128.   Plaintiff and his mother owned or had a right to possess the funds in the Interactive Brokers account (~$85,000) and the Robinhood account (> $10,000), as Plaintiff was the authorized user and family financial advisor.

129.   Defendant Natalie Uruk intentionally and without authorization exercised dominion and control over these funds by accessing the accounts, transferring approximately $100,000 to her own Chase Bank account, and using or dissipating the funds (including losing nearly all of them in scam investments).

130.   These acts were wrongful and inconsistent with Plaintiff's and his mother's rights to the property.

131.   As a direct and proximate result, Plaintiff and his mother suffered actual damages, including loss of the funds, investment opportunities and related emotional and financial harm.

132.   Plaintiff is entitled to compensatory damages, including the value of the converted funds, interest, lost investment income, and any consequential damages, to be proven at trial.

## DAMAGES FROM THEFTS

133.   As a direct result, Plaintiff suffered:

   a.  Financial loss (over $300,000 with lost investment opportunities);

   b.  Emotional distress;

   c.  Reputational harm;

   d.  Endangerment to his, his mother's, and his children's well-being.

## MUNICIPAL LIABILITY

**(Against Santa Barbara [Police Department, Sheriff's Office, Probation Department, and District Attorney's Office])**

**NINETEENTH CLAIM: Municipal Liability (Monell – 42 U.S.C. § 1983)**

134.   Each municipal Defendant maintained policies, customs, or practices that were the moving force behind the repeated constitutional violations alleged in this Complaint, including First Amendment retaliation, Fourteenth Amendment due process and

41

equal protection violations, Eighth Amendment deliberate indifference and failure to protect, and conspiracy to deprive civil rights.

135.   These policies, customs, or practices include, but are not limited to:

a. Deliberately ignoring or refusing to investigate credible reports of serious crimes (including identity theft, financial fraud, child abuse, and perjury) when made by individuals labeled as vexatious litigants, convicted felons, Turkish-Americans, or those exercising constitutional rights against the prosecution;

b. Selectively accepting and acting upon misleading or false reports from favored parties (such as Defendant Natalie Uruk) while systematically dismissing or refusing to investigate reports from disfavored individuals like Plaintiff, even when unrelated to any pending prosecution or probation matter;

c. Preparing, advancing, and relying on false or incomplete police/probation reports despite available exculpatory evidence (such as GPS data, surveillance video, mental illnesses, and recantations of Natalie), as demonstrated by the actions of Officer Mestas and

42

Detective Ford in the farmers' market incident and the subsequent probation violation proceedings;

d. Failing to protect vulnerable individuals in custody from known risks of harm, including deliberate indifference to serious mental health conditions and physical safety concerns, as evidenced by the assaults and inadequate protections during Plaintiff's jail detention despite repeated notifications;

e. Retaliating against individuals for exercising protected First Amendment rights (speech, complaints, trials, appeals, and rejection of plea offers) through arbitrary denials of benefits, false accusations, and imposition of unauthorized conditions, as shown by probation directives/conditions;

f. Allowing or encouraging coordinated actions among agencies to pursue baseless proceedings while ignoring exculpatory evidence and legitimate victim complaints, as reflected in the overall pattern from jail mistreatment, through probation violations, and refusal to investigate the thefts.

136. This pattern is evidenced by specific incidents, including, but not limited to:

43

a.  The arbitrary denial of in-house detention, failure to accommodate mental health needs, and exposure to assault risks in county jail (Sheriff's Office defendants);

b.  The preparation of false police reports and recommendations despite exculpatory evidence, leading to probation violation proceedings (Defendants Officer Mestas and Detective Ford);

c.  The imposition of unauthorized and unreasonable probation conditions, reliance on false reports in the probation violation report, and refusal to consider exculpatory evidence (Probation Officer Faanono and Probation Department);

d.  The repeated refusal to investigate or accept reports of theft, identity theft, child abuse, perjuries, and law enforcement misconduct complaints, including formal denials by the Sheriff's Office (on behalf of Sheriff Brown) and the DA's Office (Investigators Shamordola and McGrew, DDAs Somait and London, DA Savrnoch).

137.  These policies, customs, or practices were not isolated acts of individual employees but were sufficiently widespread, persistent, and ratified at the departmental level to constitute de facto policies under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

44

138.  The municipal Defendants' failure to train, supervise, or discipline employees on proper investigation procedures, protection of vulnerable individuals in custody, non-retaliatory enforcement, and equal treatment of complainants further contributed to the violations.

### DAMAGES FROM MUNICIPAL LIABILITIES

139.  As a direct and proximate result of these policies, customs, and practices, Plaintiff suffered the constitutional deprivations and injuries alleged throughout this Complaint (incorporated here).

### VI. RELIEF SOUGHT

140.  Plaintiff requests:

   a. **Compensatory damages** in the amount of **$15,000,000** (joint and several against all Defendants), including but not limited to:

      i.   Over $300,000 in stolen and lost funds and lost investment opportunity;

      ii.  Severe, long-term emotional distress, mental anguish, and psychological harm (exacerbation of PTSD, depression, anxiety, claustrophobia, OCD);

      iii. Physical injuries and permanent vision impairment;

45

iv.     Extended loss of liberty, educational opportunities, and professional prospects;

v.     Reputational harm and interference with parental/family relationships;

all to be proven at trial;

b. **Punitive damages** in the amount of **$1,000,000 against each individual Defendant** for willful, malicious, oppressive, and reckless conduct;

c. **Nominal damages** in the amount of **$1** against each municipal agency Defendant to recognize the constitutional violations;

d. Declaratory judgment that Defendants violated Plaintiff's constitutional rights;

e. Injunctive relief requiring the municipal agency Defendants to investigate the thefts, correct false records, reform policies on investigations/protections, and refrain from retaliatory/discriminatory conduct;

f. Costs of suit and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

46

g. Pre-judgment and post-judgment interest;

h. Such other relief as the Court deems just, equitable, and proper.

Dated: January 17, 2026

Respectfully submitted,

**Cevdet Uruk**
Plaintiff, Pro Se

47

## VERIFICATION

I, Cevdet Uruk, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on January 17, 2026, at Santa Barbara, California.

**Cevdet Uruk**

Plaintiff, Pro Se

48

## ATTACHMENTS

1. Hate Crimes and Child Abuse by Justice

2. Probation Violation Report

3. Police Reports

4. Deputy Reports

5. Bank Statements

6. Sheriff Office's Response to Thefts

7. Sheriff's Office's Response to Complaint

8. Law Enforcement Contact Email

9. Communication With Lieutenant Brittingham

10. District Attorney's Office's Response

49

## CERTIFICATE OF SERVICE

I, Cevdet Uruk, Plaintiff pro se, hereby certify that I have requested service of the Summons, Complaint, and all accompanying documents upon the Defendants by the United States Marshals Service pursuant to 28 U.S.C. § 1915(d) and Federal Rule of Civil Procedure 4(c)(3), as I am requesting leave to proceed in forma pauperis.

I have provided the Clerk of the Court with completed Summons forms (AO 440) and U.S. Marshal Service forms (USM-285) containing the names and addresses of each Defendant as required.

Upon information and belief, the U.S. Marshals Service will effect service of process and file proof of service with the Court in due course.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on January 17, 2026, at Santa Barbara, California.

*Cevdet Uruk*

**Cevdet Uruk**

Plaintiff, Pro Se

50

**DEFENDANTS**

1
SANTA BARBARA COUNTY SHERIFF'S OFFICE,
SHERIFF BROWN
4434 Calle Real
Santa Barbara, CA 93110

2
DEPUTY J. MALON
SANTA BARBARA COUNTY SHERIFF'S OFFICE
4434 Calle Real
Santa Barbara, CA 93110

3
SERGEANT DUGGER
SANTA BARBARA COUNTY SHERIFF'S OFFICE
4434 Calle Real
Santa Barbara, CA 93110

4
LIEUTENANT S. CELMETA,
SANTA BARBARA COUNTY SHERIFF'S OFFICE,
4434 Calle Real
Santa Barbara, CA 93110

5
LIEUTENANT R. BRITTINGHAM,
SANTA BARBARA COUNTY SHERIFF'S OFFICE,
4434 Calle Real
Santa Barbara, CA 93110

6
SERGEANT A. KOUREMETIS,
SANTA BARBARA COUNTY SHERIFF'S OFFICE,
4434 Calle Real
Santa Barbara, CA 93110

7
DEPUTY W. HENEBRY,
SANTA BARBARA COUNTY SHERIFF'S OFFICE,
4434 Calle Real

51

Santa Barbara, CA 93110

8
SANTA BARBARA COUNTY PROBATION DEPARTMENT,
Chief Probation Officer Holly Benton
117 E. Carrillo St.
Santa Barbara, CA 93101

9
PROBATION OFFICER R. FAANONO
SANTA BARBARA COUNTY PROBATION DEPARTMENT
117 E. Carrillo St.
Santa Barbara, CA 93101

10
SANTA BARBARA POLICE DEPARTMENT
Chief Kelly Ann Gordon
215 East Figueroa Street
Santa Barbara, CA 93101

11
OFFICER R. MESTAS
SANTA BARBARA POLICE DEPARTMENT
215 East Figueroa Street
Santa Barbara, CA 93101

12
DETECTIVE B. FORD
SANTA BARBARA POLICE DEPARTMENT
215 East Figueroa Street
Santa Barbara, CA 93101

13
SANTA BARBARA COUNTY DISTRICT ATTORNEY'S OFFICE
District Attorney John T. Savrnoch
1112 Santa Barbara Street
Santa Barbara, CA 93101

14
INVESTIGATOR K. SHAMORDOLA,
SANTA BARBARA COUNTY DISTRICT ATTORNEY'S OFFICE
1112 Santa Barbara Street

52

Santa Barbara, CA 93101

INVESTIGATOR D. MCGREW
SANTA BARBARA COUNTY DISTRICT ATTORNEY'S OFFICE
1112 Santa Barbara Street
Santa Barbara, CA 93101

NATALIE URUK
1021 Cienaguitas Rd
Santa Barbara, CA 93110

53

ATTACHMENT 1:
HATE CRIMES AND CHILD ABUSE
BY JUSTICE

## SANTA BARBARA PROSECUTORS, ATTORNEYS & JUDGES CONSPIRED TO COMMIT HATE CRIMES, CHILD ENDANGERMENT/ABUSE, ELDER ABUSE, ROBBERIES & FRAUDS[1]

### Abstract

*A Turkish-American stay-at-home Dad with advanced degrees, and his three little children and old mother, have been persecuted with his false prosecutions, wrongful convictions, cruel sentences to maximum term (12 years in prison and consecutive unheard-of jail) and a 6-year no-contact with his children, and judicial robbery of almost all of his separate property and his mother's life saving, due to hatred stemming from racism, sexism and vindictiveness for turning down the prosecution's plea offer of probation with no custody time and instead exercising his constitutional rights to freedom of expression, trials, and appeals.*

---

[1] I apologize for my limited English and unlimited candor. It's not my intention to disrespect anyone. My intentions are limited to defending my children, myself, my country (America), justice, and humanity. However, my over a decade of experience with the justice system and five years of imprisonment have verified that this is the most effective defense against bullies.

1



My children on my lap in 2018

### 1.    I was a Stay-at-Home Turkish-American Dad as a Former Finance Professor

I was a stay-at-home Turkish-American Dad to three little children (ages 1, 3, and 5 in 2019), providing primary care as a former Adjunct Professor of Finance at reputable American universities, with a PhD (ABD), an MBA, CFA, and CPA credentials.

My then-wife, Natalie, was the breadwinner as a Software Analyst with an MS in Mechanical Engineering from Russia, as she wished for her career ambitions, and I agreed for the safety of the children. **She is much younger (45), taller (5'8"), and heavier (160 lbs) than I am. I am 56, 5'7", and 130 lbs.**

2

She presented herself as a Christian, and I submitted to a Christian wife. We were married at a church wedding in 2012. She was not healthy. I thought she was depressed. I healed her with a healthy diet and exercise.



I used to take my children for daily walks and weekly hikes on the beautiful Santa Barbara mountains and beaches.

### 2.    *My Wife (Natalie, the Mother) Has Been Abusing My Children and Me Physically and Mentally*

For example, once she assaulted me with a cast-iron skillet. Another time, she threw a bag of trash from the second floor at my head. She hit me uncontrollably many times. She pushed my mother and threw a bag of

3

onions at her. She kicked our daughter. She called our children stupid. She called her own father a jerk.

I left her several times. Each time, she called the Police, regretted, recanted, apologized, and forgot about it. I took her behavior to be childish and womanish. I  didn't want my children to grow up in a broken home either.

When I wanted to leave her, she also told me, **"I am gonna get your money, and I am not gonna show you the baby," and, "I'll send you to prison, and you'll die there,"** after slapping me while I was holding the baby.

I failed to assess the severity of her mental illnesses. I was looking for help from mental health professionals, friends, and churches, though. They failed me. Similar marital problems among my parents, grandparents from both sides, close friends, and even among some of the most powerful men, such as Musk, Trump, Bezos, Buffett, Ellison, and Brin, contributed to my failure. **Einstein wrote: " ....I am the triumphant survivor of two wives and the Nazi period...". Nietzsche wrote: "In love and revenge, woman is more barbarous than man."**

I respect women. My daughters, sisters, and mother are the most precious to me.

### 3.    *I Was Wrongfully Prosecuted, Convicted, and Sentenced for Exercising My First Amendment Right and Explaining the Rationale Behind the Second Amendment*

In 2014, Natalie was transferring peanut allergies to our baby through breast milk, and she was lying to me about eating peanuts. Over the confrontation, I was charged with threatening to kill Natalie for saying **"I'll**

4

**kill you if anything happens to the baby"** and battery for holding her hands to protect myself from her blows. Prosecutors discovered one of my emails to Natalie, which quoted a biblical verse: **"Wives, submit to your husbands."**

As a result of vindictiveness for my biblical quote as a Turkish man, I was prosecuted by a female Prosecutor (Arshi) of Iranian descent, represented by a female Public Defender (Kerimian) of Armenian descent (who was nice), and judged by a female judge (Dandona) for exercising my right under the First Amendment. By the way, Judge Dandona had been in a losing legal battle with her ex-husband over child support, as well.

I turned down the plea offer for the infraction. Senior female prosecutors were screaming during the recess of the trial, "This is a criminal trial", in an attempt to influence the judge and the jury.

I was convicted of battery with the admission of Natalie's inadmissible hearsay statements as the sole evidence. She invoked the Fifth Amendment and refused to testify. Her admissible recanting and inconsistent statements were not admitted into evidence. I was sentenced to probation.

**I was found not guilty of threatening to kill her.**

I appealed, stating, **"The right to trial is paid for with blood and cannot be surrendered to corrupt prosecutors and judges,"** and included a newspaper (WSJ) article: **"Women Failed Humanity."**

In 2015, I was charged with a false probation violation for explaining **the rationale behind the Second Amendment**. I was sentenced to two months in jail for responding to it by stating **"...the violation allegation constitutes the corruption of obese officials...."**

5

*4.      Infamous Judge Carrozzo Wrongfully Convicted and Cruelly Sentenced Me to Nine (9) years in Prison and Unheard-of Consecutive Three (3) Years in Jail for Turning Down the Prosecution's Plea Offer of No Jail/Prison Probation*

In 2018, Natalie threw the children's vegetable meal into the trash and lied to me, saying they had finished it. Over the confrontation, I was charged with four felonies, including allegedly choking, punching, grabbing, and dissuading her, and with four misdemeanors, including battery for holding her hands and child endangerment while trying to protect myself and my children against her violence. The children were not present. I did not choke or punch her. I deliberately and lightly grabbed and slapped her mouth **in self-defense, particularly for teaching my children to lie and for endangering their and our lives.** There was no visible injury.  I didn't know the nature of her mental illnesses. She was the aggressor. She had refused to cooperate with the therapist despite her previous agreement. The incident happened just after our return from her therapist. Again, Natalie recanted and begged me, my attorneys, and my friends to bring me back home.

6



Natalie's Text message: She was begging me to fight for her.

7

Because of the vindictiveness for my prior "obese officials" statement, **I was assigned an obese prosecutor (Chanda) and an obese judge (Carrozzo).** I was offered a felony probation with no prison or jail time. I turned it down due to legal misadvice. I wanted to settle. My private attorney, Levinson, who the State paid, told me, "Carrozzo is a better judge….there is no supporting evidence for the alleged offenses…you might end up with probation violation….let's go try," and pushed me to trial.



Left: The Prosecution's plea offer. Right: Childless cat lady, Prosecutor Chanda, and Judge Carrozzo, who was barred from the bench for life due to other misconduct.

8

Just before the trial in 2019, Natalie went to the DA's Office alleging that I left her and the children with a bear in the wilderness and ran away two years prior, and I assaulted her in Turkiye six months prior. As usual, she regretted and recanted. No new charges were filed and those allegations were not introduced into evidence.

Carrozzo wrongfully convicted me of all charges except one by admitting Natalie's false, inadmissible hearsay statements (She invoked the Fifth Amendment and refused to testify again.) as the sole evidence and excluding her admissible recanting and inconsistent statements, and with no visible injury despite the fact that Prosecutor Chanda told the jury subconsciously: " **I hope you find him not [sic] guilty of all charges".**



Natalie's photos taken by the Police just after the 911 calls in 2014 and 2018. Later, she told the Probation that she sustained the mark in her mouth by bumping into the wall. Probably, she bit her mouth while talking when I slapped it lightly. Also, she had an implant cover on her front teeth. Her teeth didn't have the strength to bite an apple due to decay caused by sugar addiction. She already had the crack on her lip. I did not touch her face. The redness on her face is a result of her lies. She lied to the police that she had a bruised and bloody lip, I tried to choke her, and I threatened to kill her.

Ten to twenty people from the District Attorney's Office attended my trial in an attempt to influence the judge and the jury. I had no one.

9

**I was found not guilty of endangering my children.**

After the convictions, Natalie cried and pleaded to bring me back home. She also brought a newly discovered piece of evidence: her psychiatric report for her mental illnesses: PTSD due to childhood traumas, delusions, and major depression.



10

From: Natalie Uruk natalie.uruk@gmail.com
Subject: Sentencing statement
Date: August 1, 2019 at 11:14 AM
To: ndllaw@cox.net

Hello Mr. Levinson,

Attached please find the sentencing statement I have prepared along with a doctor's note.

Probation office will have it attached to her recommendation.

Kind regards,
Natalie Uruk

805-259-9249

---

The Holman Group

## Coordination of Care Form

CONSENT FOR RELEASE OF CONFIDENTIAL INFORMATION TO PCP AND/OR OTHER HEALTH CARE PRACTITIONERS

I, Natalie Uruk , 5/29/1980 authorize

Heidi Lindros, LMFT , to release health information related to my evaluation and treatment to: Dr. Bulton

Information to be completed by Behavioral Health Provider

The following treatment is being provided:
[X] Outpatient Therapy  Frequency 2x/wk

[X] Individual Psychotherapy
[ ] Family Psychotherapy
[ ] Group Psychotherapy
[ ] Couples Therapy
[ ] Other

Client has above symptoms:

nightmares
flashbacks
hyper vigilance,
acute generalized anxiety
severe depression w/
fleeting SI—most of life
Premenstrual Dysphoria
Anger/Rage outbursts
insomnia
sugar addiction
days w/ agitation
& (r/o mania)

[ ] Medication Management  Frequency:

Medications and Dosages: Please assess for medication mgmt

My diagnosis @ this time is PTSD MDD

[ ] Intensive Outpatient  Frequency

[ ] Inpatient Treatment

[ ] Partial Hospitalization

[ ] Residential Treatment

If you have any questions or would like to discuss this case in greater detail, please call me at:
(949) 973-4170

Heidi Lindros, LMFT  Heidi Lindros  LMFT #86053  7/23/19

I understand that the release of this information is to permit my treating physician and other health care practitioners to monitor my health status and to coordinate all the care I may receive. This authorization becomes effective on the date signed and may be revoked by me at any time in writing, except to the extent action has been taken and reliance hereon.
All parties agree to comply with Protected Health Information pursuant to HIPAA regulations contained in 45CFR Parts 160 and 164. This authorization also authorizes the release of information under the California Confidentiality of Medical Information Act of 1980, Section 56 et seq. of the California Code.

07/25/2019

---

Natalie's in-court statement at my sentencing and her attached psychiatric report. She admitted her mental illnesses. She also acknowledged that I am a loving husband and devoted father. She no longer remembers reality, and she does not forget the details of her delusions. This is the main characteristic of her mental illnesses, and the prosecutors made her condition worse.

11

Carrozzo sealed the psychiatric report without even looking at it. He denied postponing the sentencing. He denied the opportunity to file a motion for a new trial based on the newly discovered evidence. He denied me the right to speak.

**He illegally sentenced me to the maximum term:** nine (9) years in prison for felonies (at 33%) for allegedly grabbing her neck, slapping her mouth and dissuading her, and consecutive unheard of three (3) years in jail (at 50%) even without the 70+ days presentence credit for misdemeanors, for grabbing her hands, and 3-year no-contact order with her (not with my children), out of a single case/incident, despite the presentence report recommending probation, the Prosecutor asking for seven (7) years in prison -no jail- and Natalie crying and pleading for no prison/jail time.

**If I had killed her, the maximum term he could have given me was 4 years in prison for manslaughter, if the self-defense defense failed.**

The convictions were affirmed with a one-year sentence reduction by the California Court of Appeal (by Justices Gilbert, Tangeman, and Perren).

5.    *The Convictions are Under Habeas Corpus Appeal for Over Three Years in the U.S. District Court.*

It took another three years to reach this stage. If the federal judge(s) have a little honor, they should be overturned simply due to the failures of trial counsel (Levinson) and appellate counsel (Hernandez) in raising the very strong claim of the violation of the constitutional Confrontation Clause, among other ineffective assistances of counsels. I should have had

12

the right to confront my accuser. Natalie never took the stand. I wanted her to testify. I wasn't allowed to testify by the counsels.

In prison, I continued researching Natalie's mental illnesses, attended college, worked as an aid to the GED teacher, walked the yard, read, wept and prayed for my children, and prepared my appeals. I was also sentenced to solitary confinement (hole) for telling the GED Teacher, **"I became an American because 20 years ago, the majority of Americans were not corrupt. "**

6.      *Natalie Suffers From Very Severe Mental Illnesses (Paranoid-Schizophrenia)*

**I discovered that Natalie suffers from paranoia and schizophrenia, not PTSD, depression, or childhood traumas.** She makes her own diagnosis in her in-court statement.  She is a violent and sadomasochistic paranoiac. She is not reachable. She is not curable. She fought with her father after my incarceration, and sent him to jail as well, after begging him to come from Russia to help her with the children. Her terrifying 911 call during the alleged battery by her father and the following sheriff deputy report stating that no battery was determined are self-explanatory. I also discovered that she had abused her sister and her mother as well. She made several false police calls on her next-door neighbour and strangers, too. Her around 20 false police calls should be sufficient to prove her insanity. Our family friends and Pastor attest to my statements.

7.      *Natalie Stole My Mother's and My Money (over $100,000)*

Just before I was paroled from prison in 2021, **Natalie stole my mother's and my IDs and monies (over $100,000) with the help of her**

13

**four attorneys from the Legal Aid Foundation (Gans, Robinson, Diaz, Agnello) in conspiracy with the prosecutors, before filing for divorce.** The Sheriff's Department, the DA's Office, and the courts refused even to hear. She lost almost all of them in scam stock and crypto investments, along with an additional ~$150,000 from an unknown source, likely from a charity, with the assistance of the DA's Office. She also caused similar investment losses(~150,000) in some of my IRA accounts and accumulated massive credit card debt, exceeding $80,000.



14

**SCHEDULE D**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service

**Capital Gains and Losses**

Attach to Form 1040, 1040-SR, or 1040-NR.
Go to www.irs.gov/ScheduleD for instructions and the latest information.
Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10.

OMB No. 1545-0074

**2022**

Attachment Sequence No. **12**

Name(s) shown on return: NATALIE AND CEVDET URUK

Your social security number

Did you dispose of any investment(s) in a qualified opportunity fund during the tax year? ☐ Yes ☒ No
If "Yes," attach Form 8949 and see its instructions for additional requirements for reporting your gain or loss.

**Part I** — **Short-Term Capital Gains and Losses — Generally Assets Held One Year or Less** (see instructions)

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| 1a Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b | 25,938. | 249,334. | | -223,396. |
| 1b Totals for all transactions reported on Form(s) 8949 with **Box A** checked | | | | |
| 2 Totals for all transactions reported on Form(s) 8949 with **Box B** checked | 7,921. | 4,819. | | 3,102. |
| 3 Totals for all transactions reported on Form(s) 8949 with **Box C** checked | | | | |

| | | |
|---|---|---|
| 4 Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 | 4 | |
| 5 Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | 5 | |
| 6 Short-term capital loss carryover. Enter the amount, if any, from line 8 of your **Capital Loss Carryover Worksheet** in the instructions | 6 | ( ) |
| 7 Net short-term capital gain or (loss). Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on the back | 7 | -220,294. |

**Part II** — **Long-Term Capital Gains and Losses — Generally Assets Held More Than One Year** (see instructions)

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part II, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| 8a Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b | 275. | 1,591. | | -1,316. |
| 8b Totals for all transactions reported on Form(s) 8949 with **Box D** checked | | | | |
| 9 Totals for all transactions reported on Form(s) 8949 with **Box E** checked | 795. | 1,552. | | -757. |
| 10 Totals for all transactions reported on Form(s) 8949 with **Box F** checked | | | | |

| | | |
|---|---|---|
| 11 Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824 | 11 | |
| 12 Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 | 12 | |
| 13 Capital gain distributions. See the instrs. | 13 | |
| 14 Long-term capital loss carryover. Enter the amount, if any, from line 13 of your **Capital Loss Carryover Worksheet** in the instructions | 14 | ( ) |
| 15 Net long-term capital gain or (loss). Combine lines 8a through 14 in column (h). Then, go to Part III on the back | 15 | -2,073. |

BAA For Paperwork Reduction Act Notice, see your tax return instructions.    FDIA0612L  07/18/22    Schedule D (Form 1040) 2022

My mother's brokerage account statement and Natalie's capital loss schedule from our joint tax return filed by Natalie. Natalie stole over $85,000 from my mother. That was almost all of my mother's life savings. Natalie should be prosecuted for theft from the elderly in addition to false police reports, perjury, child abuse, and spousal and parental abuse.

15

**In 2021, I was granted a non-violent parole from prison because none of my alleged offenses were violent under the law (Pen. Code, § 667.5).**

*8.     I was Subjected to Further Vindictive Prosecution and an Illegal and Inhumane Sentence of a 5-year No-contact Order with my Children and Declared "One of the Most Dangerous Defendants" for Exercising My Right to Appeal My Wrongful Convictions*

I was expecting to be in in-house detention for the jail part of my sentence.

Instead, as a result of vindictiveness for my appeal, **I was charged with an additional 17 years in prison** for attempting to dissuade Natalie after the trial and sentencing (legally and factually impossible felony) and baseless four counts of misdemeanor for violating the no-contact order with her through my legitimate one letter and three phone calls from prison to my children for their safety, health, and welfare, which were needed, requested, and facilitated by Natalie.

I wasn't barred from contacting my children. I called my cell phone to talk to them. Natalie wanted to speak and asked for money. I told her I couldn't talk to her unless she modified the no-contact order. She said she would. Then she changed her mind, saying that I was dangerous. She started baiting me to call her cell phone to talk to the children. I didn't. I suspect the prosecutors dissuaded her with financial and legal assistance. Then she requested a temporary domestic violence no-contact order (DVRO) that also included my children, based on the letters and phone calls to my children that she had initiated, requested, and facilitated. She also admits to kicking our daughter in her perjured declaration. She is prone to the manipulation of ill-intended people due to her mental illnesses. She

16

70

has been receiving PTSD therapy for her paranoia, and that's very dangerous, especially if the medication is involved.

She also declared/revealed that she was a feminist and that she would raise my daughters to be feminists.

She became hostile to our family friends and our Pastor, who had been supporting her against me in any way possible, including financially. She sent them an email threatening them not to help me. The email was defamatory.

My public defender, Speredelozzi, was not effective. My friends hired a private attorney, Chambliss. He started asking for more money and bullying me to accept the prosecution's plea offer of four years in prison or go to trial. I didn't know that he was known for horse-trading cases with the prosecution.

I decided to represent myself. The prosecution had to drop the impossible felony charge of attempting to dissuade a witness.

I pleaded guilty to the groundless misdemeanor charges out of fear of further vindictiveness (particularly after seeing Carrozzo with the presiding judge), with the hope of in-house detention. Judge Anderson sentenced me to a consecutive 1-year jail term and 3-year **DV probation (for the legitimate one letter and three phone calls)** with GPS monitoring, a 26-week Batterer's Treatment Program, 20-hour community work service, and an illegal and inhumane 5-year criminal no-contact order (CPO) with my children based on the temporary DVRO. The courts lacked the authority to bar me from contacting my children (children were not the victims of my alleged offenses).

17

71

Chanda declared me **"One of the most dangerous defendants"** on the record.

In jail, I was denied in-house detention due to Chanda's intervention, who had no authority in the decision, despite being eligible and suitable, as evidenced by an objective **low-risk assessment of 1/10 (even with the convictions) by the parole and probation departments using validated assessment tools.**

In jail, I was also accused of **assaulting violent jail gangs** for defending myself and ending up in the ER.

*9.    The Great American Judges = The Racist Child Endangerrers/Abusers[2] Refuse to Hear Me and Terminate the Illegal and Inhumane CPO and DVRO Barring Me From Contacting My Children*

In 2022, Commissioner Foley issued a 5-year DVRO barring me from contacting my children, based on the CPO that was issued following the temporary DVRO he had previously issued, without holding a proper hearing to evaluate the children's best interests. He was in a hurry to go to lunch. **It's a catch-22 situation, and it's impossible to terminate or modify the no-contact orders. Each judge said the other needs to make the first modification.**

---

[2] Depriving three little children of their primary caregiver, a stay-at-home Dad, with wrongful convictions, cruel sentences, and illegal and inhumane no-contact orders by corrupt judges, and leaving them to the care of a mentally ill, violent, and dangerous mother who has been abusing them physically and psychologically, squarely fits the meaning and legal definition of child endangerment/abuse.

In California, child endangerment is defined by Penal Code 273a as the act of willfully causing or permitting a child to suffer or be placed in a situation where their health, safety, or well-being is endangered. This can include inflicting unjustifiable pain or suffering, or willfully causing or permitting a child's injury or a dangerous situation. A conviction does not require that the child be physically harmed, only that the conduct created a risk of harm.

18

In the divorce court, Judge Geck stated that she had no authority to modify the no-contact orders. I showed her the law that grants her the controlling authority to do so for the safety, health, and welfare of the children, which the law states should be the primary concern of the court. Then she said she wouldn't do it and recused herself. She denied my motion to consolidate the DVRO case into the dissolution case.

I was deprived of my legal right (even a noncustodial parent's legal right) to access my children's medical and school records by Commissioner Hubner. She also found it's in the best interest of the children to have no contact with me and be abused by Natalie, by taking notice of my Robinhood statement instead of Natalie's psychiatric report, and without hearing. She didn't consolidate the DVRO case into the dissolution case either.

19

 

  

 

The Great American Judges = The Racist Child Endangerers/Abusers: Dandona, Anderson, Foley, Hubner, Geck, Anderle (also a robber and fraudster), and Montes de Oca (also a prison bully) (Left to right).

### 10.    90-year-old Judge Anderle Robbed Me of My Due Process, Children, and Separate Property

Judge Anderle robbed me of my due process (no cross-examination), parental rights (no-contact with my children), and separate property (house, money, retirement savings, vehicles, and belongings) against the valid premarital agreement and the family law provisions and forced me into servitude to work for minimum wage and pay half of it as child support

20

starting while incarcerated, disabled, unemployed, indigent, and fighting for my children's and my lives, after a completely unfair trial.

He also declared me a vexatious litigant for trying to protect my children and property against three great American Attorneys who intended to feed themselves by stealing a Turkish Inmate's property and the food of fatherless children. He dismissed my defamation suit against Natalie, as well[3]. He quashed my subpoena(s) to produce my children's school and (medical) records. He didn't consolidate the DVRO case into the dissolution case, either.

**Anderle was biased - if he had hearing and mental competencies at age 90-. He initially indicated that he would modify the no-contact orders at the trial, but he didn't.** His court committed frauds by entering a false default on appeal without even the required notice, losing the trial exhibits, and destroying the subpoenaed Police Reports. He also didn't comply with the Court of Appeal's order to include the remaining subpoenaed documents in the record. I didn't default. The appeal continues.

### 11.    Judge Montes de Oca Denied my Due Process Rights and Acted like a Prison Bully and Another Child Endangerer/Abuser in the False Probation Violation Charges

Just after my release at the end of 2023, I was charged with a **false probation violation for being staged by Natalie and her attorneys** at the farmer's market and a nature preserve, and for legally accessing my children's medical records (before being restrained). They wanted the divorce trial concluded while I was in jail so that I couldn't respond, and

---

[3] I was declared vexatious litigant for filing four legitimate requests for orders in the dissolution case NOT for the dismissed defamation suit against Natalie.

21

they could steal all my separate property to destroy me in conspiracy with the prosecutors. When I had a glimpse of Natalie, I couldn't recognize her since **she had become obese, and she had a scar on her forehead sustained during a fight with her father after my incarceration**. She told the Police she hit the chair while running away from him. She also said in her court deposition that her father gave her a big blow, and mine was lighter.

Natalie chased me at the farmer's market and nature preserve to stage me by leaving her full-time day job and a sick child at home without any help, family, relatives, or friends. I left the areas immediately when I had a glimpse of her. The GPS tracks clearly showed that, and the Prosecution still charged me with the violation, even though they couldn't bring new criminal charges for the false Police reports. The GPS Officer told me that Natalie had called him several other times, alleging that I was following her, although the GPS showed I was not in the alleged area.

Judge Montes de Oca denied all my motions (judicial notices, no-contact CPO modification, effective assistance of counsel, advisory counsel, ancillary services, self-representation, discovery, disqualifications of the Judge and the DA's Office, venue change, continuance due to my disability, pending appeal, and FBI investigation). He called the illegal and inhumane CPO as appropriately issued, despite my showing him the law.

He sealed Natalie's psychiatric report and bank statements. He didn't even allow me to speak. He threatened to put me back in jail in an attempt to force me to plead guilty. He refused to answer my questions. He stated he didn't need to explain to me anything when I asked for reasoning for his rulings, indicating that he could rule arbitrarily and capriciously. He stated nothing else (my wrongful convictions, Carrozo's bar from the bench,

22

conspiracy, Natalie's ~20 false police calls, her mental illness, her credibility, her motivation, her thefts from my mother and me, her child and elder abuses) is relevant, indicating that if the GPS shows me in the alleged areas, that would be sufficient to find me in violation. I reminded him of the Evidence Code, § 210, which states that credibility evidence is relevant evidence. He stated that I acknowledged being in the alleged areas, and indicated that I was already guilty.

He stated that he would request the GPS tracks and Natalie's communication with the Probation Department. Then he didn't remember. He said he would check for my unapplied 70+ days credit from 2016. Then he refused to look at it. I presented him with the Prosecutors' lies. He stated that it was ok for the prosecutors to lie. He lacks mental competency. He denied me the effective assistance of legal counsel and advisory counsel. He refused to talk about the CPO. Then he stated that I need to seek legal advice from an attorney to modify the illegal CPO.

He and or the prosecutor leaked a confidential hearing to Natalie's attorneys in the family law case without a court order, in breach of confidentiality and professional ethics. He stated that there is nothing wrong with the breach.

In November 2025, he found me guilty of violation for the farmer's market incident, but not for the nature preserve incident. He didn't allow access to medical records to come to the hearing. He extended my probation for six months. I had already completed my three-year probation successfully in May 2025. He unreasonably and unconstitutionally barred me from visiting the nature preserve. He illegally and inhumanely extended the no-contact order with my children for an additional year. He is a

23

faithless and shameless human being. He shouldn't be allowed to serve justice, even in Mexico.

The prosecution had offered a plea bargain for an additional 10-year CPO, barring me from contacting my children.

**They are all faithless and shameless racist child endangerers/abusers.**

*12.      This is Far Worse Than the Movie "Midnight Express"*

My children don't have anyone to hug (no father, family, relatives, or friends). Natalie recently bought them two cats to hug and to make them like herself: a lonely, obese paranoiac. She has been poisoning them with spoiled food, medication, poor hygiene, and sugar. My children used to run to me for safety when Natalie started hitting, kicking, and yelling at them. They are crying in their sleep for their father.

When I begged Chanda and Carrozzo for their sake on Zoom from jail, they exhibited animal pleasure.

The faithful (Christians, Muslims, and Jews) protected me from the other animals in prison.

I served an 8-year prison term for felonies in two (2) years. I also served a 4-year jail term for misdemeanors in two (2) years.

I remain a grateful American patriot. I studied law in prison and am now pursuing a law degree. **However, this is far worse than the movie "Midnight Express."**

The Bible states: "Take no part in the unfruitful works of darkness, but instead expose them."

24

"Cursed is anyone who withholds justice from the foreigner, the fatherless or the widow."

**13.     *Carrozzo Is Barred From The Bench For Life In 2025 (Due To His Other Misconducts).***

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on January 17, 2026, at Santa Barbara, California.

Cevdet 'JD' Uruk

███████████████████ loving Dad

25

ATTACHMENT 2:
PROBATION VIOLATION REPORT

The Superior Court, State of California
For the County of Santa Barbara

| DIVISION: CRIMINAL | BRANCH: SANTA BARBARA | |
|---|---|---|
| PLAINTIFF: THE PEOPLE OF THE STATE OF CALIFORNIA | | |
| DEFENDANT: CEVDET URUK | | |
| PROBATION VIOLATION REPORT | | |
| Calendared: March 29, 2024; 8:30 a.m.; Judge Adams; Dept. 8 | ☐ Ex-parte | DPO #: 261 SPO #: 001 | Case #: 21CR07917 |

I, the undersigned, certify and report:

1.  I am a Probation Officer for the County of Santa Barbara.  Within the course and scope of my employment, I have learned of facts which I believe constitute a violation of the terms and conditions of probation of this defendant.

2.  CASE HISTORY:

The defendant was, on May 20, 2022, granted probation for conviction of violation of Sections 166(c)(1) PC, CONTEMPT/VIOLATION OF DOMESTIC VIOLENCE PROTECTIVE ORDER (4 Counts), all misdemeanors, for the period of three (3) years **to expire on May 20, 2025**, under the terms and conditions which include:

No. 5    Obey all laws and commit no similar violation of law.

No. 27   Comply with PC 136.2 Protective Order, Do not annoy, threaten, or harass or contact the protected parties.

3.      REASONS WHY DEFENDANT IS IN VIOLATION OF PROBATION:

The defendant failed to comply with the Criminal Protective Order (CPO) of the no contact clause regarding the victim in this instant offense. The victim has made reports to law enforcement about the close encounter with the defendant.

4.      ADDITIONAL INFORMATION:

On May 20, 2022, the defendant was granted probation while serving two years in county jail on another case related to the victim in the instant offense.  The defendant was ordered to be placed on the Global Positioning System (GPS) upon his release from jail for the entirety of his Probation in this case.

On October 20, 2023, the defendant was released from jail and placed on GPS.

On October 24, 2023, during an office appointment, the defendant was reminded of the no contact clause with the victim.

On October 30, 2023, the undersigned reminded the defendant about his no contact order with the victim.

On November 29, 2023, the defendant enrolled in the Batterer's Intervention Program (BIP).

81

Pro-159-A (Rev. 12/21)                              CONFIDENTIAL PROBATION REPORT PER PC 1203.5

On January 6, 2024, GPS Officer Macedo spoke with the defendant via telephone about going to the San Marcos Preserve near the victim's home in the morning. The defendant stated he liked to go there to run and has been there several times. GPS Officer Macedo warned the defendant about the area as it may expose him to potential risk of any accusations. While not a violation of the exclusion zone or stay away order, this location is in the immediate proximity of the victim's residence and his visit to this area may increase the likelihood of contact. On the same date, the victim contacted GPS Officer Macedo regarding her concern of the defendant going to the San Marcos Preserve near her home, as her neighbor had seen him and advised her. GPS Officer Macedo informed the victim the defendant had been warned.

According to the Santa Barbara Police Department (SBPD) report #24-200152, on January 19, 2024, the victim in the instant offense completed an online report alleging a violation of a CPO several days after the incident as it took her some time to process the event. On January 20, 2024, Officer Mestas was assigned to follow up with the victim's report. Officer Mestas spoke with the victim via telephone. The victim reported that on January 16, 2024, at approximately 3:30 p.m., she and her daughter parked in Santa Barbara City Lot #10 to visit the farmer's market on State Street. While at the farmer's market, she and her daughter were looking at various vendors. When they reached De La Guerra Street, they turned around to walk back, and she observed the defendant a few feet away walking toward her and her daughter. She made eye contact with the defendant and described his facial expression to be a grimace of anger and disgust. The defendant continued to walk toward her and her daughter and he was approximately two to three feet from them before he continued to walk past them without flinching. Her daughter appeared to have not seen the defendant. The victim and her daughter walked back to their vehicle at City Lot #10 and as they walked back, the victim noticed at the corner of her eye a person of similar size and colored clothing as the defendant walking approximately 15 to 20 feet behind them. As the victim turned her head, she saw a person similar to the defendant quickly rush behind one of the vendors. Later the same day, the victim contacted GPS Officer Macedo to obtain data on the defendant's GPS monitor, as she suspected he may have followed her and her daughter while at the farmer's market. She received a call from GPS Officer Macedo who confirmed the defendant was at City Lot #10 around the same time as her and her daughter. Officer Mestas forwarded the police report to the Detective Bureau for review and follow up for the surveillance footage from City Lot #10.

On January 17, and 19, 2024, the victim contacted GPS Officer Macedo about the defendant's GPS tracks on January 16, 2024, when she saw the defendant at the Farmer's Market with suspicion he followed her and her daughter. GPS Officer Macedo reviewed the defendant's GPS tracks and confirmed the defendant was at the Farmer's Market at the same time, the defendant walked in the same direct as she was going to her vehicle, and it appeared the defendant parked his vehicle in the same general area the victim parked.

On January 25, 2024, per the GPS tracks, the defendant went to the San Marcos Preserve above the victim's residence, but he was not near the Exclusion Zone.

On January 26, 2024, per the GPS tracks, the defendant went to the San Marcos Preserve above the victim's residence, but he was not near the Exclusion Zone.

On January 30, 2024, the victim contacted GPS Officer Macedo and reported contacting the defendant at San Marcos Preserve. The defendant saw her, he turned around and did not contact her. On the same day, the defendant emailed the undersigned regarding seeing the victim and her dog at the San Marcos Preserve. The undersigned responded via email and directed the defendant to find another location for his morning run to avoid further issues. Also, on this day, the victim emailed the undersigned reporting the said incident and stated the defendant's behavior was "very distressing to me."

On January 31, 2024, the undersigned met with the defendant in the office and reviewed his Probation terms. The defendant was directed several times to find a new location for his morning run to avoid potential contact with the victim. However, the defendant did not agree with the directive.

On February 1, 2024, the victim emailed the undersigned and provided the Santa Barbara Sheriff's Office (SBSO) report number regarding the defendant's contact with her at the San Marcos Preserve (Incident Log Number 240009570). The next day, the undersigned requested the report; however, as of the writing of this report, no response was received.

On February 2, 2024, the undersigned met with the victim and she reported, in the past, the defendant has threatened to kill her and the defendant was "like a ticking time bomb." To ensure the defendant would not be upset, she would keep the house clean, feed their children, and prepare food.

According to the SBSO report #24-1595, on February 15, 2024, at approximately 10:55 a.m., Deputy Henebry was dispatched to investigate a restraining order violation. Deputy Henebry contacted the victim via telephone. The victim reported her attorney advised her the defendant appeared in Court "pro-per" and provided documents he obtained from a health care service regarding their son. The victim stated this was by means of using her login information and password. This report was forwarded to the District Attorney's Office for filing consideration as a violation of the protective order.

5.    THE FOLLOWING RECORDS AND REPORTS ARE ATTACHED:

☒    Credit for Time Served worksheet
☒    Notice of Hearing, dated March 15, 2024.
☒    Order

6.    PROGRESS ON PROBATION AND CONCLUSIONS:

Before the Court is Cevdet Uruk on his first violation of probation. The defendant had served a lengthy prison term and additional lengthy jail time at the Santa Barbara County Jail related to cases involving the same victim. According to a presentence report, the defendant physically abused and threatened to kill the victim. In an office visit with the victim, she reported the defendant had historically threatened to kill her, and expressed a sentiment of fear. She stated she would keep the house clean, the children fed, and have food prepared to avoid the defendant from being upset. With several incidents reported by the victim regarding his contact with her, it is evident the defendant is disregarding the orders of the Court and violating the CPO. In addition, the defendant is clearly aware of his actions likely putting fear into the victim, which has caused distress and concern for her safety, as well as her children. Despite participation in BIP, the defendant's lack of empathy to this situation is alarming, as he continues to show no remorse or see a problem to his

actions. Therefore, it is respectfully the defendant be ordered to stay away from the San Marcos Nature Preserve and serve 60 days in jail, forthwith.

7.   IT IS RECOMMENDED THAT:

The defendant be found in violation of probation, probation be revoked, reinstated and modified to include:

* Defendant be ordered to serve 60 days, forthwith in the Santa Barbara County Jail.

* Stay away from San Marcos Nature Preserve.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Signed at Santa Barbara, California, on March 21, 2024.

Respectfully submitted,

Holly L. Benton
Chief Probation Officer

Thu Mar 2024 03/21/24 08:45:07ontrol 5

Blank Signature - Control 4

Joseph Contreras
Supervising Deputy Probation Officer

Roshelle Faanono
Deputy Probation Officer

I have read and considered the foregoing report of the Probation Officer.

Date:_____

JUDGE OF THE SUPERIOR COURT

84

The Superior Court, State of California

## For the County of Santa Barbara

| DIVISION:<br>CRIMINAL | BRANCH:<br>SANTA BARBARA | | |
|---|---|---|---|
| PLAINTIFF:<br>THE PEOPLE OF THE STATE OF CALIFORNIA | | | |
| DEFENDANT:<br>CEVDET URUK | | | |
| ORDER | | | |
| Calendared: | ☐ Ex-parte | DPO #: 261<br>SPO #: 001 | Case #:<br>21CR07917 |

THE COURT having read and considered the report of the Probation Officer and,

☒    having found the defendant ☒ to be ☐ not to be in violation of the probation granted on May 20, 2022.

IT IS THEREFORE ORDERED THAT

☒    the defendant is continued on probation on the terms and conditions as ordered on May 20, 2022, with added term(s) and condition(s) as follows:

- Defendant be ordered to serve 60 days, forthwith in the Santa Barbara County Jail.

- Stay away from San Marcos Nature Preserve.

Date:_____          _____

JUDGE OF THE SUPERIOR COURT

Receipt of the above Order is acknowledged:

_____

CEVDET URUK

85

Pro-24a (Rev. 12/21)

## COUNTY OF SANTA BARBARA PROBATION DEPARTMENT
## CREDIT FOR TIME SERVED

| | | | | |
|---|---|---|---|---|
| **NAME:** CEVDET URUK | | | **COURT NUMBER:** | 21CR07917 |
| **PIN:** 2033899 | | | **CREDIT TYPE:** | 4019 PC 1/2 |
| **PRIMARY CHARGE:** 166(C)(1) PC  M  CONTEMPT:VIOL PROTECT ORD | | | **CID:** | 0537987 |

| Custody Type | From Date | To Date | Days Served | 4019 Credit | Total Credit |
|---|---|---|---|---|---|
| County Jail | 04/22/2023 | 10/20/2023 | 182 | 182 | 364 |
| **Total Credit** | | | 182 | 182 | 364 |

☐ 1192.7 PC: Serious felony   ☐ 667.5 PC: Violent felony   ☐ 290 PC: Sex registration required

**Comments:**

5/20/22: Granted 3 years probation; Serve 364 days jail with 0 CTS

| Custody Type | From Date | To Date | Comments |
|---|---|---|---|
| County Jail | 04/22/2023 | 10/20/2023 | Per Ts and Cs on 5/20/22, the defendant was sentence to serve 364 with 0 credits forthwith, and consecutive to #18CR02248 to be served in any penal institution.  Per SBSO inmate records, sentence deemed served on 10/20/23. |

Verified By:                                                                 3/21/2024 4:02:36 PM

86



# PROBATION DEPARTMENT
## County of Santa Barbara

117 E. Carrillo St., Santa Barbara, CA 93101
(805) 882-3700 *Fax (805) 882-3651
www.sbprobation.org

**HOLLY L. BENTON**
Chief Probation Officer

MELINDA BARRERA
Deputy Chief Probation Officer

SPENCER CROSS
Deputy Chief Probation Officer

SAM LEACH
Deputy Chief Probation Officer

DAMON FLETCHER, CPA
Chief Financial Administrative Officer

3/15/2024

CEVDET URUK
103 KINMAN AV
GOLETA, CA 93117

## NOTICE OF HEARING

Re: Violation of Probation
Court #: 21CR07917

The Probation Officer is informing the Court that you are in violation of your grant of Probation. Therefore, it is necessary that you appear in the Santa Barbara Superior Court, Santa Barbara Division, Dept. No. 8, on March 29, 2024, at 8:30 a.m.

FAILURE TO APPEAR CAN RESULT IN A WARRANT FOR YOUR ARREST BEING ISSUED.

You are advised that you are entitled to be represented by legal counsel at all stages of the proceedings in this matter.

Regards,

Fri Mar 2024 03/15/24 16:37:27          Control 9

Roshelle Faanono
Deputy Probation Officer
(805)882-3723

cc:    Court
       District Attorney
       Public Defender/Private Attorney

Pro-169 (Rev 02/2020)

87

ATTACHMENT  3:
POLICE REPORTS

# SANTA BARBARA PD
## GENERAL OFFENSE HARDCOPY
### EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152

90Z-183 OTHER OFFENSES



This is a SANTA BARBARA POLICE DEPARTMENT confidential document. Release of any information contained within this document without the express written consent of the issuing agency is unlawful dissemination, and will be considered a criminal act punishable by law. DO NOT RELEASE COPIES OF THIS REPORT TO ANYONE OUTSIDE OF YOUR IMMEDIATE DEPARTMENT. PLEASE ENSURE COMPLIANCE WITH ALL LAWS AND REGULATIONS BY FORWARDING REQUESTS FOR ADDITIONAL RELEASE(S) TO THE POLICE DEPARTMENT RECORDS BUREAU.

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                                 90Z-183 OTHER OFFENSES

# General Offense Information

Reported on: **Jan-19-2024  (Fri.) 1947**
Occurred between: **Jan-16-2024  (Tue.) 1630** and **Jan-16-2024  (Tue.) 1720**
Approved on: **Jan-20-2024  (Sat.)**  by:   **3596**
Report submitted by: **OL**
Org unit: **RECORDS**
Address: **STATE ST / E DE LA GUERRA ST**
          Municipality: **SANTA BARBARA** County: **SANTA BARBARA COUNTY**
          District: **4**   Beat: **4**   Grid: **41**
Felony/Misdemeanor: **MISDEMEANOR**
Anti Reproductive:  **N**
Gang Activity:  **N**
Identity Theft:  **N**
Zip Code:  **93101**
Special study: **NOT APPLICABLE**
Family violence: **No**

# Offenses (Completed/Attempted)

Offense: # **1   90Z-183   OTHER OFFENSES  -  COMPLETED**
Location: **Other**
Offender suspected of using: **NOT APPLICABLE (MUTUALLY EXCLUSIVE)**
Offense: # **2   90Z-137   OTHER OFFENSES  -  COMPLETED**
Location: **Other**
Offender suspected of using: **NOT APPLICABLE (MUTUALLY EXCLUSIVE)**

# Related Event(s)

**AB          2843**
**GO          200775**

21CR07917 // 00390

# Related Person

## 1.  VICTIM # 1 - URUK, NATALIE

### (Case Specific Information)

Sex: **Female**
Race: **WHITE/CAUCASIAN**
Date of birth: ██████████
Address: ██████████████████
        Municipality: **OUTSIDE JURISDICTION**    , ██████████
        District: **99**   Beat:    Grid: **UI**

**Phone Numbers**
        HOME: ██████████
        Email: ████████████████████████

### Particulars

Ethnicity: **NOT HISPANIC/LATINO**

### Linkage factors

Resident status : **RESIDENT OF JURISDICTION**
Age range : **30-49 YEARS**
Victim of :
**90Z- 137  OTHER OFFENSES -  COMPLETED**

Victim's Relationship to Offender : **Victim Was Wife**
Person's role : **ARRESTEE #1**
Person's name : **URUK, CEVDET (DOB: Jul-13-1969)**

21CR07917 // 00391

# Related Person

## 2.  ARRESTEE # 1 - URUK, CEVDET

### (Case Specific Information)

Sex: **Male**
Race: **WHITE/CAUCASIAN**
Date of birth: **Jul-13-1969**
Address: **103 KINMAN AVE**
        Municipality: **GOLETA**    , **California   93117**
        District: **99**   Beat:    Grid: **UI**
**Phone Numbers**
CELLULAR:  **(805)  259-7013**
CELLULAR:  **(805)  635-7826**
        Email:  **CEVDETURUK@HOTMAIL.COM**

### Particulars

Place of birth: **Turkey**
Occupation: **SELF**
Employer: **FINANCE**
Driver's license: **F3286546   California**
Marital status: **MARRIED**
Ethnicity: **NOT HISPANIC/LATINO**
Language(s) spoken: **ENGLISH**
Height: **5'07** Weight: **140** lbs.
Eye color: **BROWN**
Hair color: **BLACK**

### Linkage factors

Resident status : **COUNTY RESIDENT**
Age range : **50-64 YEARS**
Armed with : **UNARMED**
Offense: **90Z- 137  OTHER OFFENSES  - COMPLETED**
Arrest date: **Sep-03-2024  (Tue.)**
Arrest type: **TAKEN INTO CUSTODY (BASED ON WARRANT/FAILURE TO APPEAR)**

### Charge Summary

#### Charge # 1
Offense date: **Jan-16-2024  (Tue.) 1625**
Offense :   **CONTEMPT OF COURT:VIOLATE PROTECTIVE ORDER/ETC**
Charge statute: **PC   166(C)(1)**
Charge severity: **MISDEMEANOR**
Domestic Violence: **No**
Court: **SANTA BARBARA SUPERIOR COURT**

21CR07917 // 00392



**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
**EVIDENCE DISCOVERY REQUEST**

**GO# SB 2024-200152**                                    **90Z-183 OTHER OFFENSES**

## Related Person Synopsis

| Role and Name | Gender | DOB |
|---|---|---|
| **VICTIM # 1 - URUK, NATALIE** | **F** | |
| **ARRESTEE # 1 - URUK, CEVDET** | **M** | |

21CR07917 // 00393

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                        90Z-183 OTHER OFFENSES

# Related Arrest Report: AB# 2024-2843

Arrestee: **URUK,  CEVDET**
Date of birth: **J███████**
Related CD#: **137534**

# Arrest Information

Status: **OTHER**
Type of arrest: **SUMMONED/CITED (CITED, NOT TAKEN INTO CUSTODY)**
Reason for arrest: **OTHER-DA REQUEST FOR PROSECUTION**
Arrest date: **Sep-03-2024  (Tue.) 1205**
Rush file required: **No**
Booked into cell: **No**
Arrest agency: **SANTA BARBARA POLICE DEPT**
Arresting officers: **7189 -  FORD BRYCE**
Summary of facts: **166(C)(1) PC REFERRAL**

Arrest location

SODA zone: **No** Drug free zone: **No**

21CR07917 // 00394



**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                    90Z-183 OTHER OFFENSES

# Related Vehicle(s)

### 1.  INVOLVED # 1 - ███████████████████████████

### (Case Specific Information)

License number: ████████
State of issue: ████████
Vehicle type: **PASSENGER CAR, STATION WAGON**
Make and model: **Acura  MDX**
Style: **CARRY-ALL/SUV (e.g. BLAZER,JEEP,BRONCO)**
Year: **2002**
Color: **Silver/Aluminum**

### Master Vehicle Index Reference

License number: ████████
State of issue: ████████
**Owner Information**
Owner type: **PERSON**
Owner role: **INVOLVED**

# Related Vehicle(s)

### 2.  INVOLVED # 2 - 7EAW156, CA VIN# 4T4BE46K79R114837

### (Case Specific Information)

License number: **7EAW156**
State of issue: **California**
Vehicle type: **PASSENGER CAR, STATION WAGON**
Make and model: **Toyota  Camry**
Style: **SEDAN**
Year: **2009**
Color: **Black**

### Master Vehicle Index Reference

License number: **7EAW156**
State of issue: **California**
**Owner Information**
Owner type: **PERSON**
Owner role: **INVOLVED**

21CR07917 // 00395



**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                        90Z-183 OTHER OFFENSES

## Narrative Text

**Type** GENERAL OFFENSE
**Author** OL - OFFICER ONLINE
**Related Date** Jan-19-2024 19:47

I walked with my daughter (10 yo) from Parking Lot #10 up State Street during the Farmers Market Event. When we reached the end of the market by E De La Guerra and turned around to head back, I saw my estranged husband - Cevdet Uruk - walking straight at us, looking at me with when unkind gaze and face twisted in a grimace. There are civil and criminal protective orders in place for me and my kids. I felt paralyzed and started taking deep breaths. He walked past us mere a few feet away from me. I checked on my daughter but she didn't notice him. She was happily chatting away. I led us back to parking lot 10. Without any lingering, we picked up a few things on the way from farmers, and I led us back to the car. I didn't dare to turn around and check if Cevdet was following us. At some point when I half turned, I noticed with a side view that some figure moved hastily behind a market stall.
When I checked with GPS officer, it was confirmed that Cevdet indeed followed us all the way back to parking lot 10. What also appears is that, as coincidence has it, he arrived downtown parking lot 10 at about the same time as us and we both parked at parking lot 10. I suspect that he saw us at the beginning of the market and followed us both ways.
NOTE: report filed a few days later as it took me several days to process the incident and realize what happened

96

21CR07917 // 00396

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
*EVIDENCE DISCOVERY REQUEST*

**GO# SB 2024-200152**                                          **90Z-183 OTHER OFFENSES**

## Narrative Text

 Type GENERAL OFFENSE
 Author 25210 - MONTOJO ANTONIO
 Related Date Jan-22-2024

AUTHORED BY SGT. MONTOJO #25210

SUPPLMENTAL:
On 01/22/24, at 0800 hours, I called Probation Office Supervisor Jose Contreras in hopes of getting the GPS details for his client.  He did not answer therefore a message was left for him to return my phone call.

21CR07917 // 00397

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                    90Z-183 OTHER OFFENSES

## Narrative Text

Type GENERAL OFFENSE
Subject CITY LOT #10 FOOTAGE
Author 7189 - FORD BRYCE
Related Date Sep-03-2024

SBPD Case #24-200152
Authored by Detective B. Ford - 7189

NARRATIVE SUMMARY:
Review of City Lot #10 surveillance.

RELATED PERSONS:
Cevdet Uruk (DOB: 07-13-1969)
Natalie Uruk ▮▮▮▮▮▮▮▮▮▮)

RELATED VEHICLES:
2002 Acura MDX▮▮▮▮▮▮▮▮▮▮)
2009 Toyota Camry (CA: 7EAW156)

NARRATIVE:
On 03-19-2024 I spoke with Santa Barbara Sheriff Office Sgt Kouremetis. He was familiar with the investigation and appeared to have extensive knowledge of the on-going problems between Cevdet Uruk and Natalie Uruk. He informed me that he had a planned meeting with Uruk, and I requested he gather vehicle information so I could look for that vehicle within the City Lot #10 surveillance footage. Sgt Kouremetis informed me that he learned Uruk currently drives a black-colored Toyota Camry (CA: 7EAW156).

I reviewed the surveillance footage from City Lot #10 and observed Natalie driving into the lot at 1625 hours. She entered the lot from Ortega St and was driving her silver-colored Acura MDX ▮▮▮ ▮▮▮▮▮. Just three minutes later, at 1628 hours, Uruk is seen entering City Lot #10 from Ortega St. He is driving the Toyota Camry, and the license plate is visible throughout the footage. Uruk appears to be the solo occupant of the vehicle. I was unable to determine where Uruk parked the vehicle, and I did not locate any footage showing him walking within the lot.

Natalie is seen exiting the parking lot within her vehicle at 1654 hours. At that time, Uruk's GPS location data shows him at 907 State St, about two blocks from Natalie's location.

Uruk is seen exiting the parking lot within the Camry at 1707 hours. This is consistent with his GPS data.

BF - 7189

21CR07917 // 00398

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                    90Z-183 OTHER OFFENSES

Follow Up Report # SB 1

## Narrative Text

Type GO FOLLOW UP
Subject GPS DATA REQUEST WITH SB COUNTY PROBATION
Author 7189 - FORD BRYCE
Related Date Jan-22-2024

SBPD Case #24-200152
Authored by Det. B. Ford - 7189

NARRATIVE SUMMARY:
GPS data request with SB County Probation.

RELATED PERSONS:
Cevdet Uruk (DOB: 07-13-1969)
Natalie Uruk ███████████

NARRATIVE:
On 01-22-2024, I was assigned as a Detective within the SBPD Crimes Against Persons Detective Bureau.  On that date, I was assigned to investigate a possible restraining order violation, which was believed to have taken place on 02-16-2024.  I began by reading the associated Citizen's Crime Online report and determined the case involved Cevdet Uruk and Natalie Uruk.  Natalie was the reporting party, and also the protected party in a served protective order.  Natalie's report explains that she observed her ex-husband while at the Farmer's Market, and also believed he was following she and her child as they walked about the Farmer's Market and to her vehicle.  Natalie knew Cevdet to be on GPS through his probation, and contacted an unknown Probation Officer, who confirmed Cevdet's GPS data was consistent with him following her.

I conducted a records check of Cevdet and determined he is on active probation for 166(c)(1) PC.  Cevdet is the restrained party in a STAY-AWAY criminal protection order, which was served in person on 06-14-2022.  This order protects Natalie, her three children, and a dog.  This order also includes Cevdet staying 100-yards from the protected parties, their vehicles, residences, and work.

His listed Probation Officer is R. Faanono.  I contacted P.O. Faanono via telephone and determined she was not on duty.  Therefore, I contacted Cevdet's supervising probation officer, P.O. Contreras.  He informed me that he was aware of the on-going investigation, and he understood we wished to cross-reference Cevdet's location data.  P.O. Contreras informed me that he would attempt to get the GPS data for my review.  I later received the requested data from Sr. Deputy Probation Officer Macedo on 01-22-2024 at about 1217 hours.  The data showed that Cevdet was in the area of Kinman Ave, Goleta on 01-16-2024 at about 1530 hours.  He then appeared to travel to the area of downtown Santa Barbara and was in the area of 600-800 State St between the hours of 1630-1700 hours.

I contacted Natalie via telephone on 01-22-2024 at about 1400 hours.  She informed me that she believed she entered City Lot #10 at 1625 hours, and she departed before one hour.  She believed this to be accurate because she did not have to pay for parking when she left.  Natalie informed me that she was driving a silver Acura MDX.  Natalie also informed me that she had attached a copy of her parking stub,

21CR07917 // 00399



**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

**GO# SB 2024-200152**                                                      **90Z-183 OTHER OFFENSES**

Follow Up Report # SB  1

which was not previously documented.

I reviewed Cevdet's GPS log and determined the GPS data showed him in City Lot #10 at 1628
hours.  The locations following the City Lot show Cevdet traveling northbound on the 600, 700, and 800
blocks of State St.  However, at 1640 hours, he appears to travel back southbound on State St.  He
remained in the area of 600-800 State St until about 1705 hours, at which time he travels west.  Based on
this information, it appears as if Cevdet was in the immediate Natalie had been.


**BF - 7189**

21CR07917 // 00400

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
**EVIDENCE DISCOVERY REQUEST**

GO# SB 2024-200152                                    90Z-183 OTHER OFFENSES

Follow Up Report # SB  1

## Narrative Text

Type GO FOLLOW UP
Subject CHARGES REFERRED
Author 7189 - FORD BRYCE
Related Date Sep-03-2024

SBPD Case #24-200152
Authored by Detective B. Ford - 7189

NARRATIVE SUMMARY:
Charges referred to the District Attorney's Office.

RELATED PERSONS:
Cevdet Uruk (DOB: 07-13-1969)
Natalie Uruk ███████████████

NARRATIVE:
Based on the totality of the circumstances, I determined that Cevdet Uruk appeared to have been following Natalie Uruk and their daughter as they walked in public on State St. This was in violation of 166(c)(1) PC, based on the stay-away restraining order on file. I came to this conclusion based on Uruk's GPS data, coupled with Natalie's statement., where she explained that she and their daughter were walking on State St at the farmer's market, and then turned around and observed Uruk had been walking behind them. I believe a reasonable person would recognize their ex-wife and daughter walking shortly in front of them.

I request this report be forwarded to the District Attorney's Office for the consideration of a 166(c)(1) PC charge against Cevdet Uruk.

BF - 7189

21CR07917 // 00401

<table>
<tr><td></td><td colspan="2"><strong>SANTA BARBARA PD</strong><br><strong>GENERAL OFFENSE HARDCOPY</strong><br>EVIDENCE DISCOVERY REQUEST</td></tr>
<tr><td></td><td>GO# SB 2024-200152</td><td><strong>90Z-183 OTHER OFFENSES</strong></td></tr>
</table>

Follow Up Report # SB  2

## Narrative Text

       Type GENERAL OFFENSE
  Related Person (ARRESTEE #1) URUK, CEVDET   (DOB: Jul-13-1969)
      Subject URUK, CEVDET  DOB: 07-13-1969
     Author 26416 - MESTAS ROBERT
   Related Date Jan-21-2024  4:37

Case #24-200152 Authored by R. Mestas #26416

On 1/20/24, at approximately 2228 hours, while working uniformed patrol in a marked patrol vehicle for the Santa Barbara Police Department, I was assigned to follow up and contact the reporting party, Natalie Uruk, who filed an online report regarding a violation of a protective order by Cevdet Urk.

Natalie was at the Santa Barbara farmer's market, with one of her children, when she had seen Cevdet within the distances he had been ordered to stay away. GPS monitoring of Cevdet indicated he was at the farmer's market at the same time as Natalie and one of her children. Cevdet was currently on Santa Barbara County Probation being monitored by an ankle GPS.

Cevdet was previously convicted of the following crimes against Natalie and/or their children: Willful cruelty to child (273A(b) PC), dissuading a witness (136.1(b)(1) PC), inflict corporal injury to spouse (273.5(a) PC), assault with force likely to cause great bodily injury (245(a)(4) PC), false imprisonment (236 PC), violation of a protective order (166(c)(1) PC) and domestic battery (243(e)(1) PC).

Natalie and her three children, Elizabeth Uruk (10), Sophia Uruk (8) and Noah Uruk (5), were the protected parties of a 150 yard no contact domestic violence order (Active 6/14/22 to 6/6/27) and a 100 yard no contact criminal protective order (Active 5/20/22 to 5/20/27) from the restrained, Cevdet. Natalie and Cevdet were the parents of all three children. Natalie lived at ███████████████ with her three children. Natalie worked at 6330 Hollister Avenue. All three children attended Hope School, 3970 La Colina Road. All three of the previously mentioned addresses were included in each of the restraining orders.

I contacted Natalie, via phone and conducted an interview with her. During the interview I obtained additional details regarding the incident she initially reported. The following is a summary of Natalie's statement:

On Tuesday 1/16/24, at approximately 1530 hours, Natalie along with her daughter Elizabeth, parked in City Lot #10, 641 Anacapa Street, with the intention of going to the farmer's market on State Street. Natalie parked her vehicle in one of the parking spots along the upward ramp that connects the 1st floor of the parking garage to the second floor of the parking garage.

Natalie and Elizabeth exited the vehicle and walked to 1st East Cota Street behind World Market, 610

21CR07917 // 00402

| | |
|---|---|
| GO# SB 2024-200152 | 90Z-183 OTHER OFFENSES |

Follow Up Report # SB  2

State Street, then proceeded to State Street before walking north on the 600 block of State Street.

While walking north on State Street Natalie and Elizabeth looked at the various vendors to determine what they wanted to purchase on the return south.

Natalie and Elizabeth walked north on State Street until they reached De La Guerra Street and turned around. When Natalie turned around, now facing south on State Street, she saw Cevdet walking toward her from approximately a few feet away.

Natalie made eye contact with Cevdet and described his facial expression as having a grimace of anger and disgust. Natalie felt heavy with the feeling seeing Cevdet and looked toward her daughter to determine if she had also seen Cevdet. Elizabeth appeared to not have seen him. Cevdet had continued walking toward Natalie and had gotten within approximately 2 to 3 feet of her before continuing past her without flinching. It appeared to Natalie that Cevdet had been following her and Elizabeth rather than having just come out from between a couple of the vendors.

Natalie was too frightened to turn around to see if Cevdet had also turned around. Natalie felt that she and Elizabeth were going to be okay at this moment because they were in public with many people around.

Natalie and Elizabeth began their walk south on State Street, only stopping at two vendors to purchase strawberries and tangerines, which she had determined she was going to purchase on their walk northbound.

At some point along their walk back toward City Lot #10, Natalie had halfway turned around and, out of the corner of her eye, noticed a subject of similar size as Cevdet and appeared to be wearing similar colored clothing to Cevdet. Natalie believed the subject was Cevdet, but only having seen the subject from her peripheral vision she could not confirm it was Cevdet. The subject was approximately 15 to 20 feet behind Natalie. Immediately after Natalie had turned her head and saw the subject, the subject quickly darted behind one of the vendors and out of her sight. Natalie believed this instance occurred either on State Street at Ortega Street, or on State Street at the alleyway access to City Lot #10 adjacent to The Habit, 628 State Street.

Natalie and Elizabeth continued to her parked vehicle through the alley adjacent to The Habit, entered the vehicle and departed for their residence.


Natalie described Cevdet's description as a white male adult, wearing a black vest over a blue long sleeve cotton shirt and either dark blue or washed blue jeans.


Natalie described herself during the incident as a tall, white female adult, blond hair worn in a messy bun, wearing a bright red "Gap" hooded sweatshirt, black leggings, and a large backpack with blue and black spots.


Natalie described Elizabeth at the time of the incident as a white female juvenile, long blond ponytail, thin build, wearing a blue "Gap" hooded sweatshirt and pants that look short for her height.

21CR07917 // 00403

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

**GO# SB 2024-200152**                                    **90Z-183 OTHER OFFENSES**

*Follow Up Report # SB 2*

In the evening of that same Tuesday, Natalie reached out to a contact a person she called "GPS Officer" Jose (Phone #805-621-4885) to obtain GPS data on Cevdet's ankle monitor to see if he had been following her at the farmer's market. On Friday, 1/19/24, Natalie received a phone call from Jose who was able to confirm that Cevdet had been at City Lot #10 and the farmer's market around the same time she and Elizabeth had been there. Natalie stated she was told by Jose that Cevdet's GPS data indicated that Cevdet had arrived at City Lot #10, had walked north on State Street, turned around at De La Guerra Street and returned to City Lot #10 all around the same time as Natalie and Elizabeth.

To the best of her recollection, Natalie provided me with a list of locations she had been from Tuesday, 1/16/24, through Friday, 1/19/23. The times that Natalie stated she had been at the locations, were generalized, or an approximation to the best of her recollection. The following is the list and times of the locations Natalie had been:

21CR07917 // 00404

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                                    90Z-183 OTHER OFFENSES

Follow Up Report # SB  2

- 1/16/24, Tuesday
- Morning:
- Work - 6330 Hollister Avenue
- Lunch:
- Costco - 7095 Market Place Drive, Goleta
- Afternoon:
- Work - 6330 Hollister Avenue
- Hope School - 3970 La Colina Road, to pick up Elizabeth (between 1530 to 1600 hours)
- Farmer's Market - Where the above incident occurred (from 1630 to 1700 hours)
- Home - ███████████████
- 1/17/24, Wednesday
- Morning:
- Hope School - 3970 La Colina Road
- Home - ███████████████ where Natalie worked from remotely
- Afternoon
- Hope School - 3970 La Colina Road
- Home - ███████████████
- 1/18/24, Thursday
- Morning:
- Hope School - 3970 La Colina Road
- Home - ███████████████, where Natalie worked from remotely
- Afternoon
- Hope School - 3970 La Colina Road
- Home - ███████████████
- 1/19/24, Friday
- Morning
- Hope School - 3970 La Colina Road
- Home - ███████████████
- Lunch
- Hope School - 3970 La Colina Road (1300 hours)
- Afternoon
- Home - ███████████████
- District Attorney's Office - 1112 Santa Barbara Street (from 1450 to 1520 hours)
- Hook & Press - 15 East Figueroa Street (departed at 1600 hours)
- Home - ███████████████

Natalie confirmed with her documentation of Cevdet's information that his address was 103 Kinman Avenue, Goleta and it had been confirmed with the GPS monitor that he resided there. Additionally, Natalie provided me with Cevdet's phone number which she believes to be accurate #805-635-7826.

An additional statement of note provided by Natalie was that Cevdet was known to be very frugal and calculated with his spending of money, down to the penny, particularly regarding the fuel used by his vehicle. Natalie stated that it would be highly unusual of Cevdet to depart his residence in Goleta, drive the farmer's market in downtown Santa Barbara and drive back to his residence. It would make more sense to Natalie that Cevdet would either stop at the farmer's market if it had been on the way from one destination

21CR07917 // 00405

**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
EVIDENCE DISCOVERY REQUEST

GO# SB 2024-200152                                          90Z-183 OTHER OFFENSES

Follow Up Report # SB  2

to another or if he had multiple errands to run in the same area to make the trip worth his while. Natalie stated this was how Cevdet behaved when they lived together. Natalie mentioned that when they did live together, Cevdet enjoyed going to the downtown farmer's market every Tuesday, but as previously mentioned, he would have multiple errands in the immediate area that he would run as to not waste vehicle fuel.

Lieutenant Ahrens conducted a check of AFS for firearms associated with Cevdet which showed he owned 1 firearm. Upon checking the serial number of that firearm in AFS Lieutenant Ahrens found that the firearm had been destroyed. See attached CLETS inquiry for additional details of the firearm.

Based on Natalie seeing Cevdet within 100 yards of her and Elizabeth, possibly 2 times while at the farmer's market and her additional follow up indicating the GPS tracks of Cevdet in the same area around the same time, it appears possible that Cevdet violated the protection orders against the protected, Natalie and Elizabeth (273.6 PC and 166(c)(1) PC).

This contact was recorded with body worn camera.

I request this report be forwarded to the Detective Bureau for review and follow up for surveillance footage from City Lot #10 on 1/16/24, between 1630 and 1730 hours, possibly showing Cevdet violating the restraining orders and follow up obtaining GPS data of Cevdet between 1/16/24 and 1/19/24, which may indicate Cevdet's location corresponded with Natalie's previously listed activity on those days.

21CR07917 // 00406



**SANTA BARBARA PD**
**GENERAL OFFENSE HARDCOPY**
**EVIDENCE DISCOVERY REQUEST**

GO# SB 2024-200152                                   90Z-183 OTHER OFFENSES

# Related Property Report(s)

### Report Information

**Property Report #: 213126**
Property case status: **SEIZED/EVIDENCE**
Submitted on: **Sep-03-2024  (Tue.)**    by: **FORD BRYCE**
**Related:**
Offense: **GO  SB  2024- 200152**
Related items: **1**

### Articles - Evidence

Status: **SEIZED/EVIDENCE**                    Tag #: **SB213126- 1**
Article: **DMEMORY- Data Processing Equipment**
Serial # 1: **UNKNOWN**                          OAN:
Description: **CITY LOT FOOTAGE AND GPS DATA**
Flags:  **\*e**
Current Location: **LB LBOBA**

Flags = d (disposed) x (x-reference) n (entered on NCIC) *e (evidence)

21CR07917 // 00407

ATTACHMENT 4:
DEPUTY REPORTS

# Report of Offense
# Santa Barbara County Sheriff



**24-1595**

Supplement No
**ORIG**

4434 Calle Real

Santa Barbara, CA 93110-1002

Report Type
**DOM INCDNT**

(805)681-4100

Reported Date
02/15/2024

Officer
**HENEBRY,W**

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | Status |
|---|---|---|---|---|---|---|
| **Santa Barbara County Sheriff** | | **24-1595** | **ORIG** | **02/15/2024** | **10:55** | **Offense** |

| Report Type |
|---|
| **DV Incident (RO violation- no assault)** |

| Location | City | ZIP Code |
|---|---|---|
| ███████████ | ███████████ | ███████ |

| Rep Dist | Area | Beat | From Date | From Time | Officer |
|---|---|---|---|---|---|
| **135** | **1** | **30** | **01/26/2024** | **08:00** | **3475/HENEBRY,W** |

| Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|
| **SOUTH COUNTY OPS - GOLETA** | **3475** | **SOUTH COUNTY OPS - GOLETA** | **Successful** |

| Prop Trans Stat | Report Title | Approving Officer | Approval Date |
|---|---|---|---|
| **Successful** | **Report of Offense** | **3475** | **02/15/2024** |

| Approval Time |
|---|
| **14:18:05** |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| **1** | **PC273 6** | **Fail to obey restrai** | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| **SUS** | **1** | **I** | **URUK,CEVDET** | **863681** | **W** | **M** | **07/13/1969** |
| **VIC** | **1** | **I** | **URUK,NATALIE** | **935767** | **H** | **F** | ███████ |

## Summary Narrative

The suspect obtained info surreptitiously through a health care facility on his son. He did this by obtaining the victims information to gain access to the account. This is a violation of a Restraining/Protective order.

| Report Officer | Printed At | |
|---|---|---|
| **3475/HENEBRY,W** | **02/21/2024 11:39** | **Page 1 of 5** |

21CR07917 // 00319

# Report of Offense
# Santa Barbara County Sheriff

**24-1595**

Supplement No
**ORIG**

## Suspect 1: URUK,CEVDET

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| Suspect | 1 | Individual | URUK,CEVDET | | 863681 | White | Male |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|
| 07/13/1969 | 54 | No | 5'07" | 140# | Black | Brown | 1585282 |

| Type | Address | | City |
|---|---|---|---|
| Home | UNK | | Santa Barbara City |

| State | Date |
|---|---|
| California | 02/15/2024 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | F3286546 | California |

| Type | ID No |
|---|---|
| Social Security Number | 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 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (805)259-7013 | 02/15/2024 |

## Victim (Person) 1: URUK,NATALIE

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| Victim (Person) | 1 | Individual | URUK,NATALIE | 935767 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight |
|---|---|---|---|---|---|---|
| Hispanic/Mexican/Latin | Female | ████████ | 43 | No | 5'07" | 135# |

| Hair Color | Eye Color | PRN |
|---|---|---|
| Blond or Strawberry | Blue | 1585283 |

| Type | Address | | City |
|---|---|---|---|
| Home | ████████ | | ████████ |

| State | ZIP Code | Date |
|---|---|---|
| ████ | ████ | 02/15/2024 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | ████ | ████ |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | ████ | 02/15/2024 |

## Narrative

A) Continuation: Natalie Uruk is the reporting party and victim in this report.  Natalie's children are Sophia, Elizabeth, and Noah.  Natalie has a "protective Order" against her former husband, Cevet Uruk, which she received on 05-20-22.  Her attorney is Eric Gans.

B) Evidence:  Attached is a court record (22FL01415) that shows the suspect gained information on his protected child through an American Indian Healthcare system.

Additional Report: 23-3824/violation of restraining order.

**RESTRAINING ORDERS:**

CARPOS HIT # 001
HIT MADE ON
NAM/URUK,CEVDET NMN
FCN/5082217600234
ORI/CA0420000
OCA/21FL02117
NIC/H327576057
*** SERVED DOMESTIC VIOLENCE ORDER ***
*DO NOT ARREST OR DETAIN BASED SOLELY ON THIS RESPONSE*
THIS RESTRAINING ORDER RESPONSE MAY BE THE SAME AS:
* * * * * RESTRAINED PERSON INFORMATION * * * * *
NAM/URUK,CEVDET NMN D████████3
SEX/M RAC/W HGT/506 WGT/135 EYE/BRO HAI/GRY
MIS/CANNOT OWN,POSSESS,HAVE,BUY OR TRY TO BUY,RECEIVE OR TRY TO RECEIVE
OR IN ANY OTHER WAY GET GUNS,OTHER FIREAMRS OR AMMUNITION, RP MUST SELL
TO A LICENSED GUN DEALER OR TURN IN TO LEA ANY GUNS OR FIREARMS WITHIN
HIS IMMEDIATE POSSESSION OR CONTROL, THIS MUST BE DONE WITHIN 24 HRS,
MUST SHOW COMPLIANCE WITHIN 48 HRS, PP MAY RECORD COMMS MADE BY RP THAT

| Report Officer | Printed At | |
|---|---|---|
| 3475/HENEBRY,W | 02/21/2024 11:39 | Page 2 of 5 |

21CR07917 // 00320

# Report of Offense
# Santa Barbara County Sheriff

24-1595

Supplement No
ORIG

## Narrative

VIOLATE THE JUDGES ORDERS, BOTH RP N PP, MUST NOT TRANSF,BORROW
AGAINST,SELL,HIDE,GET RID PRTY INCLUDNG ANIMALS,MUST NOTIFY OF ANY
NEW-BIG EXPENSE
* * * * * PROTECTED PERSON INFORMATION * * * * *
PROTECTED PERSON NAME/URUK,NATALIE
PROTECTED PERSON SEX/F
ADDTL PROTECTED PERSON ██████████████████████.
ADDTL PROTECTED PERSON ██████████████████████.
ADDTL PROTECTED PERSON ██████████████████.
* * * * * PROTECTED PETS INFORMATION * * * * *
PROTECTED PET 1/BOZIT.DOG.KANGAL SHEPARD.
POSSESSION OF ANIMALS - THE PROTECTED PERSON IS GIVEN POSSESSION/CARE
OF THE ANIMALS AND THE PETS ARE PROTECTED UNDER THIS ORDER
* * * * * COURT INFORMATION * * * * *
RESTRAINED PERSON PRESENT IN COURT/YES
COURT NAME/SANTA BARBARA COUNTY SUPERIOR (SANTA BARBARA)
COURT PHONE NUMBER/(805) 882-4520
COURT CASE NUMBER/21FL02117
ISSUE DATE/20220614 EXPIRATION DATE/20270606
CONTACT PROTECTED PERSON/NO - THE RESTRAINED PERSON MUST NOT CONTACT
THE PROTECTED PERSON(S) DIRECTLY OR INDIRECTLY, BY ANY MEANS INCLUDING
TELEPHONE, MAIL, EMAIL, OR OTHER ELECTRONIC MEANS - PEACEFUL WRITTEN
CONTACT THROUGH 3RD PARTY FOR SERVICE OF LEGAL PAPERS ALLOWED.
FIREARM PROVISIONS/CANNOT POSSESS, PURCHASE, OR RECEIVE FIREARMS OR
AMMO, MUST SURRENDER ALL FIREARMS TO LEA OR SELL OR STORE WITH
LICENSED GUN DEALER, MUST SHOW PROOF OF SURRENDER TO COURT.
STAY AWAY FROM/PROTECTED PERSON,RESIDENCE,PROTECTED PERSONS VEHICLE,
ADDITIONAL PROTECTED PERSONS,WORK PLACE,CHILDS SCHOOL-DAY CARE
STAY AWAY/0100 YARDS
CUSTODY/PROTECTED PERSON
VISITATION/NO
VACATE ADDRESS/████████████████████████████
OTHER ORDERS/SEE DV-140 FOR CHILD CUSTODY-VISIT ORDR, RP MUST NOT
TAKE,SELL,HIDE,MOLEST,ATTACK,HARM,BORROW AGAINST DOG, PP GIVN SOLE
POSSESSION,CARE OF DOG, ONLY PP TO USE,CONTROL,POSS, KIA SEDONA
2007,MERZ 2005,ACURA 2002, RP MUST NOT HARRASS,HIT,FOLLOW,DESTROY
PERSNL PROP, KEEP UNDER SURVEILLANCE OR BLCK MOVEMENTS OF PP, CONTACT
DIRECTLY OR INDIRECTLY,TELEPHONE,SEND MSGS BY MAIL OR EMAIL, PEACEFUL
WRITN CONTACT THRU A ATTY OR ANTHER PERSN DOES NOT VIOLATE THIS ORDER
IMMEDIATELY CONFIRM WITH CA0420000 SANTA BARBARA CO SO SBB0
TELEPHONE 805 681-4330
********** VIOLATION MESSAGE **********
NUMBER OF PRIOR VIOLATION MSG/000
CARPOS HIT # 002
HIT MADE ON
NAM/URUK,CEVDET NONE
FCN/5082215000312
ORI/CA0420000
OCA/21CR07917
NIC/H237312724
*** SERVED CRIMINAL PROTECTIVE ORDER ***
*DO NOT ARREST OR DETAIN BASED SOLELY ON THIS RESPONSE*
THIS RESTRAINING ORDER RESPONSE MAY BE THE SAME AS:
* * * * * RESTRAINED PERSON INFORMATION * * * * *

| Report Officer | Printed At | |
|---|---|---|
| 3475/HENEBRY,W | 02/21/2024 11:39 | Page 3 of 5 |

21CR07917 // 00321

# Report of Offense
# Santa Barbara County Sheriff

24-1595

Supplement No
ORIG

## Narrative

NAM/URUK,CEVDET NONE ██████████
SEX/M RAC/W HGT/507 WGT/136 EYE/BRO HAI/GRY
MIS/RP MUST NOT STRIKE,ASSAULT SEXUALLY OR OTHERWISE,FOLLOW,
STALK,MOLEST,DESTROY OR DAMAGE PERSONAL OR REAL PROPERTY,KEEP UNDER
SURVEILLANCE, BLOCK MOVEMENTS OF PP, MUST TAKE NO ACTION TO OBTAIN THE
ADDRESSES LOCATIONS OF PP,FAMILY MEMBERS,CARETAKERS OR GUARDIAN UNLESS
GOOD CAUSE EXISTS OTHERWISE, RP MUST HAVE NO PERSONAL, ELECTRONIC,
TELEPHONIC,OR WRITTEN CONTACT WITH PP
* * * * * PROTECTED PERSON INFORMATION * * * * *
PROTECTED PERSON NAME/URUK,NATALIE
PROTECTED PERSON SEX/F
PROTECTED PERSON DOB/19800529
ADDTL PROTECTED PERSON ████████████████████████████.
ADDTL PROTECTED PERSON ███████████████████████.
ADDTL PROTECTED PERSON ████████████████████.
* * * * * COURT INFORMATION * * * * *
RESTRAINED PERSON PRESENT IN COURT/YES
COURT NAME/SANTA BARBARA COUNTY SUPERIOR (SANTA BARBARA)
COURT PHONE NUMBER/(805) 882-4520
COURT CASE NUMBER/21CR07917
ISSUE DATE/20220520 EXPIRATION DATE/20270520
CONTACT PROTECTED PERSON/NO - THE RESTRAINED PERSON MUST NOT CONTACT
THE PROTECTED PERSON(S) DIRECTLY OR INDIRECTLY, BY ANY MEANS INCLUDING
TELEPHONE, MAIL, EMAIL, OR OTHER ELECTRONIC MEANS - PEACEFUL WRITTEN
CONTACT THROUGH 3RD PARTY FOR SERVICE OF LEGAL PAPERS ALLOWED.
THE RESTRAINED PERSON MUST NOT TAKE ANY ACTION TO LOOK FOR THE
PROTECTED PERSON(S), INCLUDING ADDRESSES OR LOCATIONS
FIREARM PROVISIONS/CANNOT POSSESS, PURCHASE, OR RECEIVE FIREARMS OR
AMMO, MUST SURRENDER ALL FIREARMS TO LEA OR SELL OR STORE WITH
LICENSED GUN DEALER, MUST SHOW PROOF OF SURRENDER TO COURT.
STAY AWAY FROM/PROTECTED PERSON
STAY AWAY/0150 YARDS
OTHER ORDERS/RP MUST NOT OWN,POSSESS,PURCHASE,RECEIVE OR ATTEMPT TO
PURCHASE OR RECEIVE ANY FIREARM OR AMMUNITION, RP MUST TURN IN FIREARMS
IN POSSESSION TO A LE AGENCY OR SELL THEM TO A LICENSED GUN DEALER
WITHIN 24 HRS AND SHOW PROOF TO THE COURT WITHIN 48 HRS, PP MAY RECORD
ANY PROHIBITED COMMUNICATIONS MADE BY THE RP, OTHER ORDERS INCLUDING
STAY-AWAY ORDERS FROM SPECIFIC LOCATIONS-████████████████████████
███████████████ 6330 HOLLISTER AVE, GOLETA, CA, 3970 LA COLINA RD,
SANTA BARBARA, CA
IMMEDIATELY CONFIRM WITH CA0420000 SANTA BARBARA CO SO SBB0
TELEPHONE 805 681-4330
********** VIOLATION MESSAGE **********
NUMBER OF PRIOR VIOLATION MSG/000
********** END OF CARPOS MESSAGE **********

C) Narrative:
On Thursday, 2/15/24, at approximately 1055 hours, I was dispatched to investigate a restraining order violation at ████████████████████ in the unincorporated County area. I made contact via the telephone and spoke with the victim, Natalie Uruk.  She reported she had received information that her former husband, Cevdet Uruk, was in violation of a restraining order. Natalie told me the following:

Natalie was advised by her attorney, Eric Gans, that her former husband had appeared in court "pro-per" and had given documentation to the court where he had surreptitiously obtained records from a health care service

| Report Officer 3475/HENEBRY,W | Printed At 02/21/2024 11:39 | Page 4 of 5 |
|---|---|---|

21CR07917 // 00322

# Report of Offense
# Santa Barbara County Sheriff

**24-1595**

Supplement No
ORIG

## Narrative

regarding his son Noah.  This was by means of using Natalies log in information and passwords which would be a violation of the protective/restraining order she obtained in May 20, 2022 (21CR07917).

Based on my investigation, Cevdet obtained the medical records of Noah in violation of the protective order obtained by Natalie in violation of 273.6 PC. I request the District Attorney's Office file this charge via complaint.

### D) Attention Records:

Case submitted to DA's Office for complaint/review ATTN DDA Megan Chanda

| Report Officer | Printed At | |
|---|---|---|
| 3475/HENEBRY,W | 02/21/2024 11:39 | Page 5 of 5 |

21CR07917 // 00323

# Report of Offense
# Santa Barbara County Sheriff

**23-3824**

Supplement No
**ORIG**

4434 Calle Real

Santa Barbara, CA 93110-1002

Report Type
**DOM INCDNT**

(805) 681-4100

Reported Date
04/12/2023

Officer
**FREEDMAN,H**

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | Status |
|---|---|---|---|---|---|---|
| **Santa Barbara County Sheriff** | | **23-3824** | **ORIG** | **04/12/2023** | **09:07** | **Offense** |

| Report Type |
|---|
| **DV Incident (RO violation- no assault)** |

| Location | City | ZIP Code |
|---|---|---|
| ████████ | ████████ | ███ |

| Rep Dist | Area | Beat | From Date | From Time | Officer |
|---|---|---|---|---|---|
| **135** | **1** | **30** | **04/12/2023** | **09:07** | **4776/FREEDMAN,H** |

| Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|
| **SOUTH COUNTY OPS - GOLETA** | **4776** | **SOUTH COUNTY OPS - GOLETA** | **Successful** |

| Prop Trans Stat | Report Title | Approving Officer | Approval Date |
|---|---|---|---|
| **Successful** | **Report of Offense** | **3395** | **04/13/2023** |

| Approval Time |
|---|
| **13:52:31** |

| Other Attachments | COBAN |
|---|---|
| **Yes** | **Yes** |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| **1** | **PC273 6** | **Fail to obey restrai** | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| **SUS** | **1** | **I** | **URUK,CEVDET** | **863681** | **W** | **M** | **07/13/1969** |
| **VIC** | **1** | **I** | **URUK,NATALIE** | **935767** | **W** | **F** | ████ |

## Property Summary

| Involvement | Description |
|---|---|
| **EVD** | **Article: Other MISC   Mailed documents** |

## Summary Narrative

The suspect mailed documents to his wife in violation of a restraining order.

# Report of Offense
# Santa Barbara County Sheriff

**23-3824**

Supplement No
**ORIG**

## Suspect 1: URUK,CEVDET

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| Suspect | 1 | Individual | URUK,CEVDET | | 863681 | White | Male |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|
| 07/13/1969 | 53 | No | 5'07" | 140# | Black | Brown | 1554982 |

| Type | Address | | City |
|---|---|---|---|
| Home | 4436 CALLE REAL | | Santa Barbara City |

| State | ZIP Code | Date |
|---|---|---|
| California | 93110 | 04/12/2023 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | F3286546 | California |

| Type | ID No |
|---|---|
| Social Security Number | 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 |

## Victim (Person) 1: URUK,NATALIE

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| Victim (Person) | 1 | Individual | URUK,NATALIE | 935767 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| White | Female | ███ | 42 | No | 5'07" | 135# | Blond or Strawberry | Blue |

| PRN |
|---|
| 1554983 |

| Type | Address | | City |
|---|---|---|---|
| Home | ███ | | ███ |

| State | ZIP Code | Date |
|---|---|---|
| ███ | ███ | 04/12/2023 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | ███ | ███ |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | ███ | 04/12/2023 |

## Property

| Item | Agency | Report No | Original Incident | Original supplement | Involvement |
|---|---|---|---|---|---|
| 1 | Santa Barbara County Sheriff | 23-3824 | 23-3824 | ORIG | Evidence |

| Invl Date | In Custody? | Security | Tag No | Item No |
|---|---|---|---|---|
| 04/12/2023 | Yes | No | 09082690 | 1 |

| Description | | Typ | Cat |
|---|---|---|---|
| Mailed documents | | A | Other |

| Article | Entered Date | Entered Time | RMS Transfer | Control | |
|---|---|---|---|---|---|
| Miscellaneous items | 04/12/2023 | 13:32 | Successful | 4235 | 0413231635 |

## Narrative

(A)

**ATTACHMENTS:**

Mailed documents - E files only

**RELATIONSHIPS:**

Cevdet Uruk was the suspect.
Natalie Uruk was the victim.

(B)

**PHYSICAL EVIDENCE:**

My body worn camera was activated during the contact.

Item #1: The mailed documents were scanned as e-files, and the originals were booked as Evidence at the Sheriff's Headquarters.

**RESTRAINING ORDERS:**

CARPOS HIT # 001
HIT MADE ON
NAM/URUK,CEVDET NMN
FCN/5082217600234

| Report Officer | Printed At | |
|---|---|---|
| 4776/FREEDMAN,H | 02/21/2024 11:59 | Page 2 of 5 |

21CR07917 // 00325

# Report of Offense
# Santa Barbara County Sheriff

**23-3824**

Supplement No
**ORIG**

<span style="background-color:#800000;color:white">**Narrative**</span>

ORI/CA0420000
OCA/21FL02117
NIC/H327576057
*** SERVED DOMESTIC VIOLENCE ORDER ***
*DO NOT ARREST OR DETAIN BASED SOLELY ON THIS RESPONSE*
THIS RESTRAINING ORDER RESPONSE MAY BE THE SAME AS:
* * * * * RESTRAINED PERSON INFORMATION * * * * *
NAM/URUK,CEVDET NMN ███████████3
SEX/M RAC/W HGT/506 WGT/135 EYE/BRO HAI/GRY
MIS/CANNOT OWN,POSSESS,HAVE,BUY OR TRY TO BUY,RECEIVE OR TRY TO RECEIVE
OR IN ANY OTHER WAY GET GUNS,OTHER FIREAMRS OR AMMUNITION, RP MUST SELL
TO A LICENSED GUN DEALER OR TURN IN TO LEA ANY GUNS OR FIREARMS WITHIN
HIS IMMEDIATE POSSESSION OR CONTROL, THIS MUST BE DONE WITHIN 24 HRS,
MUST SHOW COMPLIANCE WITHIN 48 HRS, PP MAY RECORD COMMS MADE BY RP THAT
VIOLATE THE JUDGES ORDERS, BOTH RP N PP, MUST NOT TRANSF,BORROW
AGAINST,SELL,HIDE,GET RID PRTY INCLUDNG ANIMALS,MUST NOTIFY OF ANY
NEW-BIG EXPENSE
* * * * * PROTECTED PERSON INFORMATION * * * * *
PROTECTED PERSON NAME/URUK,NATALIE
PROTECTED PERSON SEX/F
ADDTL PROTECTED PERSON ██████████████████████████████.
ADDTL PROTECTED PERSON ██████████████████████████
ADDTL PROTECTED PERSON ████████████████████████.
* * * * * PROTECTED PETS INFORMATION * * * * *
PROTECTED PET 1/BOZIT.DOG.KANGAL SHEPARD.
POSSESSION OF ANIMALS - THE PROTECTED PERSON IS GIVEN POSSESSION/CARE
OF THE ANIMALS AND THE PETS ARE PROTECTED UNDER THIS ORDER
* * * * * COURT INFORMATION * * * * *
RESTRAINED PERSON PRESENT IN COURT/YES
COURT NAME/SANTA BARBARA COUNTY SUPERIOR (SANTA BARBARA)
COURT PHONE NUMBER/(805) 882-4520
COURT CASE NUMBER/21FL02117
ISSUE DATE/20220614 EXPIRATION DATE/20270606
CONTACT PROTECTED PERSON/NO - THE RESTRAINED PERSON MUST NOT CONTACT
THE PROTECTED PERSON(S) DIRECTLY OR INDIRECTLY, BY ANY MEANS INCLUDING
TELEPHONE, MAIL, EMAIL, OR OTHER ELECTRONIC MEANS - PEACEFUL WRITTEN
CONTACT THROUGH 3RD PARTY FOR SERVICE OF LEGAL PAPERS ALLOWED.
FIREARM PROVISIONS/CANNOT POSSESS, PURCHASE, OR RECEIVE FIREARMS OR
AMMO, MUST SURRENDER ALL FIREARMS TO LEA OR SELL OR STORE WITH
LICENSED GUN DEALER, MUST SHOW PROOF OF SURRENDER TO COURT.
STAY AWAY FROM/PROTECTED PERSON,RESIDENCE,PROTECTED PERSONS VEHICLE,
ADDITIONAL PROTECTED PERSONS,WORK PLACE,CHILDS SCHOOL-DAY CARE
STAY AWAY/0100 YARDS
CUSTODY/PROTECTED PERSON
VISITATION/NO
VACATE ADDRESS/████████████████████████████████████
OTHER ORDERS/SEE DV-140 FOR CHILD CUSTODY-VISIT ORDR, RP MUST NOT
TAKE,SELL,HIDE,MOLEST,ATTACK,HARM,BORROW AGAINST DOG, PP GIVN SOLE
POSSESSION,CARE OF DOG, ONLY PP TO USE,CONTROL,POSS, KIA SEDONA
2007,MERZ 2005,ACURA 2002, RP MUST NOT HARRASS,HIT,FOLLOW,DESTROY
PERSNL PROP, KEEP UNDER SURVEILLANCE OR BLCK MOVEMENTS OF PP, CONTACT
DIRECTLY OR INDIRECTLY,TELEPHONE,SEND MSGS BY MAIL OR EMAIL, PEACEFUL
WRITN CONTACT THRU A ATTY OR ANTHER PERSN DOES NOT VIOLATE THIS ORDER
IMMEDIATELY CONFIRM WITH CA0420000 SANTA BARBARA CO SO SBB0

| Report Officer<br>**4776/FREEDMAN,H** | Printed At<br>**02/21/2024 11:59** | **Page 3 of 5** |
|---|---|---|

21CR07917 // 00326

# Report of Offense
# Santa Barbara County Sheriff

**23-3824**

Supplement No
**ORIG**

## Narrative

TELEPHONE 805 681-4330
********** VIOLATION MESSAGE **********
NUMBER OF PRIOR VIOLATION MSG/000
CARPOS HIT # 002
HIT MADE ON
NAM/URUK,CEVDET NONE
FCN/5082215000312
ORI/CA0420000
OCA/21CR07917
NIC/H237312724
*** SERVED CRIMINAL PROTECTIVE ORDER ***
*DO NOT ARREST OR DETAIN BASED SOLELY ON THIS RESPONSE*
THIS RESTRAINING ORDER RESPONSE MAY BE THE SAME AS:
* * * * * RESTRAINED PERSON INFORMATION * * * * *
NAM/URUK,CEVDET NONE DOB/19690713
SEX/M RAC/W HGT/507 WGT/136 EYE/BRO HAI/GRY
MIS/RP MUST NOT STRIKE,ASSAULT SEXUALLY OR OTHERWISE,FOLLOW,
STALK,MOLEST,DESTROY OR DAMAGE PERSONAL OR REAL PROPERTY,KEEP UNDER
SURVEILLANCE, BLOCK MOVEMENTS OF PP, MUST TAKE NO ACTION TO OBTAIN THE
ADDRESSES LOCATIONS OF PP,FAMILY MEMBERS,CARETAKERS OR GUARDIAN UNLESS
GOOD CAUSE EXISTS OTHERWISE, RP MUST HAVE NO PERSONAL, ELECTRONIC,
TELEPHONIC,OR WRITTEN CONTACT WITH PP
* * * * * PROTECTED PERSON INFORMATION * * * * *
PROTECTED PERSON NAME/URUK,NATALIE
PROTECTED PERSON SEX/F
PROTECTED PERSON DOB/19800529
ADDTL PROTECTED PERSON ███████████████████████████.
ADDTL PROTECTED PERSON ████████████████████████
ADDTL PROTECTED PERSON ████████████████████
* * * * * COURT INFORMATION * * * * *
RESTRAINED PERSON PRESENT IN COURT/YES
COURT NAME/SANTA BARBARA COUNTY SUPERIOR (SANTA BARBARA)
COURT PHONE NUMBER/(805) 882-4520
COURT CASE NUMBER/21CR07917
ISSUE DATE/20220520 EXPIRATION DATE/20270520
CONTACT PROTECTED PERSON/NO - THE RESTRAINED PERSON MUST NOT CONTACT
THE PROTECTED PERSON(S) DIRECTLY OR INDIRECTLY, BY ANY MEANS INCLUDING
TELEPHONE, MAIL, EMAIL, OR OTHER ELECTRONIC MEANS - PEACEFUL WRITTEN
CONTACT THROUGH 3RD PARTY FOR SERVICE OF LEGAL PAPERS ALLOWED.
THE RESTRAINED PERSON MUST NOT TAKE ANY ACTION TO LOOK FOR THE
PROTECTED PERSON(S), INCLUDING ADDRESSES OR LOCATIONS
FIREARM PROVISIONS/CANNOT POSSESS, PURCHASE, OR RECEIVE FIREARMS OR
AMMO, MUST SURRENDER ALL FIREARMS TO LEA OR SELL OR STORE WITH
LICENSED GUN DEALER, MUST SHOW PROOF OF SURRENDER TO COURT.
STAY AWAY FROM/PROTECTED PERSON
STAY AWAY/0150 YARDS
OTHER ORDERS/RP MUST NOT OWN,POSSESS,PURCHASE,RECEIVE OR ATTEMPT TO
PURCHASE OR RECEIVE ANY FIREARM OR AMMUNITION, RP MUST TURN IN FIREARMS
IN POSSESSION TO A LE AGENCY OR SELL THEM TO A LICENSED GUN DEALER
WITHIN 24 HRS AND SHOW PROOF TO THE COURT WITHIN 48 HRS, PP MAY RECORD
ANY PROHIBITED COMMUNICATIONS MADE BY THE RP, OTHER ORDERS INCLUDING
STAY-AWAY ORDERS FROM SPECIFIC LOCATIONS-████████████████████████
████████████ 6330 HOLLISTER AVE, GOLETA, CA, 3970 LA COLINA RD,
SANTA BARBARA, CA

| Report Officer | Printed At | |
|---|---|---|
| 4776/FREEDMAN,H | 02/21/2024 11:59 | **Page 4 of 5** |

21CR07917 // 00327

# Report of Offense
# Santa Barbara County Sheriff

**23-3824**

Supplement No
**ORIG**

<span style="background-color:#8B0000;color:white">**Narrative**</span>

IMMEDIATELY CONFIRM WITH CA0420000 SANTA BARBARA CO SO SBB0
TELEPHONE 805 681-4330
********** VIOLATION MESSAGE **********
NUMBER OF PRIOR VIOLATION MSG/000
********** END OF CARPOS MESSAGE **********

(C)

## NARRATIVE:

On Wednesday, 4/12/23, at approximately 0907 hours, I was dispatched to investigate a restraining order violation at ███████████████ in the unincorporated County area. I spoke with the victim, Natalie Uruk, via phone, and she reported she had received mail from her husband, Cevdet Uruk, in violation of a restraining order. Natalie requested to meet with me at the Sheriff's Headquarters to turn over the mail.

I met with Natalie at the Sheriff's Headquarters minutes later, and she gave me an unopened envelope which Cevdet appeared to have mailed to her from the jail, where he was in custody. Natalie allowed me to open the letter and examine the contents. Based on a cursory review of the contents, it appeared Cevdet had filed paperwork to sue Natalie for libel at the Santa Barbara Superior Court and had then forwarded the documents to Natalie.

Natalie did not want anything to do with Cevdet or his documents and requested I take them.

Based on my investigation, Cevdet mailed documents directly to Natalie (as opposed to her attorney), in violation of 273.6 PC. I request the District Attorney's Office file this charge via complaint.

(D)

## DISPOSITION:

Case submitted to DA's Office for complaint/review ATTN DDA Megan Chanda

| Report Officer<br>**4776/FREEDMAN,H** | Printed At<br>**02/21/2024 11:59** | **Page 5 of 5** |
|---|---|---|

21CR07917 // 00328

ATTACHMENT 5:
BANK STATEMENTS

# Interactive Brokers

# Activity Statement

January 1, 2021 - December 31, 2021

? Help

Interactive Brokers LLC, Two Pickwick Plaza, Greenwich, CT 06830

## Account Information

| Name | Ikbal Uruk |
|---|---|
| Account | ▮▮▮▮▮ |
| Account Type | Individual |
| Customer Type | Individual |
| Account Capabilities | Margin |
| Base Currency | USD |

## Net Asset Value

| | December 31, 2020 Total | December 31, 2021 Long | Short | Total | Change |
|---|---|---|---|---|---|
| Cash | 94,734.84 | 9,686.80 | 0.00 | 9,686.80 | -85,048.04 |
| Stock | 7,189.00 | 5,830.00 | 0.00 | 5,830.00 | -1,359.00 |
| Total | 101,923.84 | 15,516.80 | 0.00 | 15,516.80 | -86,407.04 |
| Time Weighted Rate of Return | | | | | -2.03% |

| Change in NAV | Total |
|---|---|
| Starting Value | 101,923.84 |
| Mark-to-Market | -1,359.00 |
| Deposits & Withdrawals | -85,000.00 |
| Dividends | 20.62 |
| Withholding Tax | -6.19 |
| Other Fees | -62.47 |
| Ending Value | 15,516.80 |

## Mark-to-Market Performance Summary

| Symbol | Quantity Prior | Current | Price Prior | Current | Mark-to-Market P/L Position | Transaction | Commissions | Other | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| **Stocks** | | | | | | | | | | |
| TCEHY | 100 | 100 | 71.8900 | 58.3000 | -1,359.00 | 0.00 | 0.00 | 14.43 | -1,344.57 | |
| Total Stocks | | | | | -1,359.00 | 0.00 | 0.00 | 14.43 | -1,344.57 | |
| **Forex** | | | | | | | | | | |
| USD | 94,734.84 | 9,686.80 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total Forex | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Total (All Assets) | | | | | -1,359.00 | 0.00 | 0.00 | 14.43 | -1,344.57 | |
| Other Fees | | | | | | | | | -62.47 | |
| Total P/L for Statement Period | | | | | | | | | -1,407.04 | |

## Realized & Unrealized Performance Summary

| Symbol | Cost Adj. | Realized S/T Profit | Realized S/T Loss | Realized L/T Profit | Realized L/T Loss | Realized Total | Unrealized S/T Profit | Unrealized S/T Loss | Unrealized L/T Profit | Unrealized L/T Loss | Unrealized Total | Total | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Stocks** | | | | | | | | | | | | | |
| TCEHY | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,654.00 | 0.00 | 1,654.00 | 1,654.00 | |
| Total Stocks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,654.00 | 0.00 | 1,654.00 | 1,654.00 | |
| Total (All Assets) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,654.00 | 0.00 | 1,654.00 | 1,654.00 | |

## Cash Report

| | Total | Securities | Futures |
|---|---|---|---|
| **Base Currency Summary** | | | |
| Starting Cash | 94,734.84 | 94,734.84 | 0.00 |
| Withdrawals | -85,000.00 | -85,000.00 | 0.00 |
| Dividends | 20.62 | 20.62 | 0.00 |
| Other Fees | -62.47 | -62.47 | 0.00 |
| Withholding Tax | -6.19 | -6.19 | 0.00 |
| Ending Cash | 9,686.80 | 9,686.80 | 0.00 |
| Ending Settled Cash | 9,686.80 | 9,686.80 | 0.00 |

## Open Positions

| Symbol | Quantity | Mult | Cost Price | Cost Basis | Close Price | Value | Unrealized P/L | Code |
|---|---|---|---|---|---|---|---|---|
| **Stocks** | | | | | | | | |
| **USD** | | | | | | | | |
| TCEHY | 100 | 1 | 41.7600 | 4,176.00 | 58.3000 | 5,830.00 | 1,654.00 | |
| Total | | | | 4,176.00 | | 5,830.00 | 1,654.00 | |

121

## Deposits & Withdrawals

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2021-09-22 | Disbursement Initiated by Cevdet C Uruk | -5,000.00 |
| 2021-09-23 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-09-24 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-09-27 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-10-04 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-10-06 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-10-07 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-11-01 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| 2021-11-29 | Disbursement Initiated by Cevdet C Uruk | -10,000.00 |
| **Total** | | **-85,000.00** |

## Fees

| Date | Description | Amount |
|---|---|---|
| Other Fees | | |
| USD | | |
| 2021-06-22 | TCEHY(US88032Q1094) Cash Dividend USD 0.206225 per Share - FEE | -2.47 |
| 2021-09-23 | Withdrawal Fee | -10.00 |
| 2021-09-24 | Withdrawal Fee | -10.00 |
| 2021-09-27 | Withdrawal Fee | -10.00 |
| 2021-10-06 | Withdrawal Fee | -10.00 |
| 2021-10-07 | Withdrawal Fee | -10.00 |
| 2021-11-29 | Withdrawal Fee | -10.00 |
| **Total** | | **-62.47** |

## Withholding Tax

| Date | Description | Amount | Code |
|---|---|---|---|
| USD | | | |
| 2021-06-22 | TCEHY(US88032Q1094) Cash Dividend USD 0.206225 per Share - US Tax | -6.19 | |
| **Total** | | **-6.19** | |

## Dividends

| Date | Description | Amount |
|---|---|---|
| USD | | |
| 2021-06-22 | TCEHY(US88032Q1094) Cash Dividend USD 0.206225 per Share (Ordinary Dividend) | 20.62 |
| **Total** | | **20.62** |

## Change in Dividend Accruals

| Symbol | Date | Ex Date | Pay Date | Quantity | Tax | Fee | Gross Rate | Gross Amount | Net Amount | Code |
|---|---|---|---|---|---|---|---|---|---|---|
| Starting Dividend Accruals in USD | | | | | | | | | 0.00 | |
| Stocks | | | | | | | | | | |
| USD | | | | | | | | | | |
| TCEHY | 2021-05-20 | 2021-05-21 | 2021-06-22 | 100 | 6.17 | 2.42 | 0.21 | 20.57 | 11.98 | Po |
| TCEHY | 2021-05-20 | 2021-05-21 | 2021-06-22 | 100 | 6.18 | 2.47 | 0.21 | 20.59 | 11.94 | Po |
| TCEHY | 2021-05-20 | 2021-05-21 | 2021-06-22 | 100 | 6.19 | 2.47 | 0.21 | 20.62 | 11.96 | Po |
| TCEHY | 2021-05-20 | 2021-05-21 | 2021-06-22 | 100 | -6.17 | -2.42 | 0.21 | -20.57 | -11.98 | Re |
| TCEHY | 2021-05-20 | 2021-05-21 | 2021-06-22 | 100 | -6.18 | -2.47 | 0.21 | -20.59 | -11.94 | Re |
| TCEHY | 2021-06-22 | 2021-05-21 | 2021-06-22 | 100 | -6.19 | -2.47 | 0.21 | -20.62 | -11.96 | Re |
| **Total** | | | | | **0.00** | **0.00** | | **0.00** | **0.00** | |
| Ending Dividend Accruals in USD | | | | | | | | | 0.00 | |

122

## Financial Instrument Information

| Symbol | Description | Conid | Security ID | Listing Exch | Multiplier | Type | Code |
|--------|-------------|-------|-------------|--------------|------------|------|------|
| Stocks | | | | | | | |
| TCEHY | TENCENT HOLDINGS LTD-UNS ADR | 55279376 | US88032Q1094 | PINK | 1 | ADR | |

## Codes

| Code | Meaning | Code (Cont.) | Meaning (Cont.) |
|------|---------|--------------|-----------------|
| A | Assignment | LD | Adjusted by Loss Disallowed from Wash Sale |
| ADR | ADR Fee Accrual | LI | Last In, First Out (LIFO) tax basis election |
| AEx | Automatic exercise for dividend-related recommendation. | LT | Long Term P/L |
| Adj | Adjustment | Lo | Direct Loan |
| AI | Allocation | M | Entered manually by IB |
| Aw | Away Trade | MEx | Manual exercise for dividend-related recommendation. |
| B | Automatic Buy-in | ML | Maximize Losses tax basis election |
| Bo | Direct Borrow | MLG | Maximize Long Term Gain tax basis election |
| C | Closing Trade | MLL | Maximize Long Term Loss tax basis election |
| CD | Cash Delivery | MSG | Maximize Short Term Gain tax basis election |
| CP | Complex Position | MSL | Maximize Short Term Loss tax basis election |
| Ca | Cancelled | O | Opening Trade |
| Co | Corrected Trade | P | Partial Execution |
| Cx | Part or all of this transaction was a Crossing executed as dual agent by IB for two IB customers | PI | Price Improvement |
| ETF | ETF Creation/Redemption | Po | Interest or Dividend Accrual Posting |
| Ep | Resulted from an Expired Position | Pr | Part or all of this transaction was executed by the Exchange as a Crossing by IB against an IB affiliate and is therefore classified as a Principal and not an agency trade |
| Ex | Exercise | R | Dividend Reinvestment |
| FP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as principal. | RED | Redemption to Investor |
| FPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as principal. | RP | IB acted as agent for the fractional share portion of this trade, which was executed by an IB affiliate as riskless principal. |
| G | Trade in Guaranteed Account Segment | RPA | IB acted as agent for both the fractional share portion and the whole share portion of this trade; the fractional share portion was executed by an IB Affiliate as riskless principal. |
| GEA | Exercise or Assignment resulting from offsetting positions | Re | Interest or Dividend Accrual Reversal |
| HC | Highest Cost tax basis election | Ri | Reimbursement |
| HFI | Investment Transferred to Hedge Fund | SI | This order was solicited by Interactive Brokers |
| HFR | Redemption from Hedge Fund | SL | Specific Lot tax basis election |
| I | Internal Transfer | SO | This order was marked as solicited by your Introducing Broker |
| IA | This transaction was executed against an IB affiliate | SS | Customer designated this trade for shortened settlement and so is subject to execution at prices above the prevailing market |
| INV | Investment Transfer from Investor | ST | Short Term P/L |
| IPO | This transaction was executed as part of an IPO in which IB was a member of the selling group and is classified as a Principal trade. | T | Transfer |
| L | Ordered by IB (Margin Violation) | Un | Unvested shares from stock grant |

## Notes/Legal Notes

Notes

123